**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| COLEMAN MCCALL, JR. | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO.  11-5689 |
| CITY OF PHILADELPHIA, | : | |
| | : | |
| Defendant. | : | |

<u>**MEMORANDUM**</u>

BUCKWALTER, S.J.                                                                    October 29, 2013

Currently pending before the Court are the Cross-motions for Summary Judgment filed by

Plaintiff Coleman McCall ("Plaintiff" or "McCall") and Defendant City of Philadelphia

("Defendant" or "City").  For the following reasons, Plaintiff's Motion is denied in its entirety and

Defendant's Motion is granted in part and denied in part.

**I.      STATEMENT OF FACTS**

The present litigation involves a claim by Plaintiff against the City under the anti-

retaliation provisions of the Family and Medical Leave Act, 29 U.S.C. § 2601, <u>et seq.</u> ("FMLA"),

the Americans With Disability Act of 1990, as amended, 42 U.S.C. §§ 1211, <u>et seq.</u> ("ADA"), and

the Pennsylvania Human Relations Act, 647 Pa.C.S § 951, <u>et seq.</u> ("PHRA").  Both parties now

seek summary judgment on these claims.

**A.      The City's Relevant Employment Policies and Civil Service Regulations**

Civil Service Regulation 22.01 provides as follows:

22.01 – GENERAL PROVISIONS.   No officer or employee in the Civil Service shall
absent himself from duty without leave except in case of sickness or great emergency.

An employee who is absent from the service without a valid leave of absence for five consecutive working days shall be deemed to have abandoned his position and to have resigned from the service unless he shall within a period of ten (10) calendar days next succeeding such five (5) days prove to the satisfaction of the Director that such failure was excusable; provided however, that nothing herein contained shall be construed as preventing an appointing authority from suspending or discharging an employee on account of unauthorized absence.

(Def.'s Mot. Summ. J., Ex. C.) Regulation 22.02 goes on to state:

22.02 – LEAVES OF ABSENCE WITHOUT PAY, GRANTING OF. The appointing authority, subject to the approval of the Director, may grant a leave of absence without pay for a period not exceeding one year, to an employee upon the employee's written request. Such leave, however, may, for meritorious reasons, be extended for additional periods with the approval of the appointing authority and the Director. The employee's written request shall state the duration of the requested leave and the reason for the request. Medical documentation shall accompany requests for medical leaves. If a leave request is denied and such denial will have the effect of causing the employee's separation from City service, the employee shall be notified in writing that his/her request has been denied and that he/she may appeal such action to the Civil Service Commission within (30) days.

(Id.) Finally, Regulation 22.05 provides:

22.05 – INFORMAL LEAVES OF ABSENCE WITHOUT PAY NOT TO EXCEED FIFTEEN (15) WORKING DAYS. The appointing authority may, at his discretion, grant to employees upon their request informal leaves of absence, without pay, not to exceed fifteen (15) working days. Such leaves of absence do not require the approval of the Director and the granting of such leaves of absence without pay need not be reported to the Personnel Department.

(Id.)

In addition, the City maintains a City-wide sick leave policy, which sets forth requirements for obtaining and taking sick leave. (Def.'s Mot. Summ. J., Ex. D.) This policy affords paid leave for all permanent Civil Service employees, including eleven paid holidays, vacation based on years of service, administrative leave days, sick leave, and funeral leave. (Id.) The Philadelphia Airport itself, where Plaintiff worked, also maintains a sick leave policy specifically for Airport employees, (Def.'s Mot. Summ. J., Ex. E), as well as a policy on unpaid leave. (Def.'s Mot.

Summ. J., Ex. F.) Notably, none of these policies require employees or their physicians to identify a medical condition on a sick leave notice. (Def.'s Mot. Summ. J., Exs. D, E, & F.) Nonetheless, Yvonne Howard, the Airport's Human Resources Director, testified that when a medical leave of absence is applied for, the employee must submit medical documentation indicating what the leave is for, the duration of time, and a written request from the employee and approval from the manager and the Human Resources office. (Def.'s Mot. Summ J., Ex. W, Dep. of Yvonne Howard ("Howard Dep.") 153:22–154:6, July 12, 2012.) All of these policies are included in a booklet entitled, "The Family and Medical Leave Act: Guidelines for City of Philadelphia Employees." (Def.'s Mot. Summ. J., Ex. I.) Plaintiff signed a form on March 30, 2001, indicating receipt of this booklet. (Id.)

Before August of 2009, supervisors approved the use of unpaid time leave with little or no guidance. (Def.'s Mot. Summ. J., Ex. H, Dep. of Christine Derenick-Lopez ("Lopez Dep."), 61:21–62:62:5, Nov. 26, 2012.) As a result, Christine Derenick-Lopez, the Assistant Director of Aviation for the City, went through several meetings with the local union and ultimately issued an August 28, 2009 memorandum clarifying the use of unpaid leave. (Derenick-Lopez Dep. 63:7–64:4.) The memorandum indicated that, in accordance with Civil Service Regulation 22.05, the "appointing authority **may, at his discretion,** grant to employees upon their request informal leaves of absence, without pay, not to exceed fifteen (15) working days." (Def.'s Mot. Summ. J., Ex. G (emphasis in original).) She further explained that, effective September 7, 2009, the Division of Aviation would evaluate all requests for unpaid leave and decisions would be made on a case-by-case basis, considering documentation of an emergency, grave illness, or disabling injury; the employee's attendance, work, and disciplinary histories; previous unpaid leave status;

3

and the impact of the unpaid leave on the Division of Aviation.  (Id.)  Finally, the memorandum

noted that "[t]he exceptions to the use of unpaid leave include: eligible employees with a

qualifying condition under the Family and Medical Leave Act, and Military Leave of Absence."

(Id.)  Ms. Lopez testified that there was no ADA impact study done relative to this memorandum.

(Lopez Dep.  85:10–17.)

From 2007 through 2009, Lucinda West (formerly Lucinda Goss) handled administration

of FMLA leave.  (Def.'s Mot. Summ. J., Ex. J, Dep. of Lucinda West ('West Dep.") 15:6–11,

Nov. 9, 2012.)  She was trained in the handling of FMLA matters.  (Id. at 16:9–18:22, Def.'s Mot.

Summ. J., Ex. K.)  She explained that she could only approve FMLA leave if an employee

provided a proper medical reason.  (West Dep. 18:23–19:4.)

**B.** **Plaintiff's Employment With the City and ADA Accommodations**

From April 17, 2000 until April 5, 2011, Plaintiff was employed with Defendant City of

Philadelphia as a "Custodial Worker 1" at the Airport.  (Def.'s Statement of Undisputed Facts

("DSUF") ¶ 1; Pl's Resp. to Defendant's Statement of Undisputed Facts ("PRSUF") ¶ 1.)

Custodial workers were responsible for the cleaning and maintenance of the Airport.  (Def.'s Mot.

Summ. J., Ex. A, Dep. of Coleman McCall ("McCall Dep."), 49:4–7, Apr. 25, 2013; Def.'s Mot.

Summ. J., Ex. B.)

Sometime in 2003, Plaintiff was diagnosed with severe bilateral knee arthritis and

degenerative joint disease.  (DSUF ¶ 17; PRSUF ¶ 17.)  In both 2003 and 2005, Plaintiff sought

accommodations from the City in the form of work modifications and documented his need for

those accommodations with medical support.  (DSUF ¶ 18; PRSUF ¶ 18.)  On each occasion, the

City approved Plaintiff's request and granted the accommodations.  (Id.)  Specifically, on October

28, 2005, Plaintiff submitted a note from his doctor asking that he be allowed to use a ride-on burnisher rather than one that required him to walk behind it. (DSUF ¶ 20; PRSUF ¶ 20; Def.'s Mot. Summ. J., Ex. M.) When the City requested more detailed medical documentation, Plaintiff provided additional information from his doctor. (DSUF ¶¶ 21–22; PRSUF ¶¶ 21–22; Def.'s Mot. Summ. J., Ex. M.) By way of a letter dated November 11, 2005, the City accommodated his request for the ride-on burnisher. (Id.) In addition, the City approved Plaintiff for a period of light duty, (McCall Dep. 77:10–15), and gave him extra days off for medical treatment. (Id. at 78:9–12.) Plaintiff also depended highly on his fifteen allotted unpaid leave days per year to manage his disability. (Id. at 74:22–11.) During Plaintiff's employment with the City, he remained able to perform the essential functions of his position with reasonable accommodations, despite his knee conditions. (DSUF ¶ 19; PRSUF ¶ 19.)

### C. Plaintiff's Use of FMLA Leave

During his tenure with the City, Plaintiff used FMLA leave numerous times for his knee condition, his depressive disorder, and other authorized reasons. (DSUF ¶ 26; PRSUF ¶ 26.) Specifically, Plaintiff used FMLA for six days' leave in 2002; from September 21, 2004 to October 21, 2004; from May 6, 2005 to July 11, 2005; from March 3, 2006 to May 3, 2006; intermittently between May 10, 2006 and May 10, 2007, and June 4, 2008 and July 12, 2008; from August 28, 2008 to November 28, 2008; intermittently between August 12, 2009 and October 9, 2009; and from August 11, 2010 to October 2, 2010. (Def.'s Mot. Summ. J., Ex. N; DSUF ¶ 26; PRSUF ¶ 26.) In addition, Plaintiff used FMLA leave in December 2006 due to the death of his father, (DSUF ¶27; PRSUF ¶ 27), and intermittently from June 4, 2008 to August 27, 2008 due to the premature birth of his twin children. (DSUF ¶ 28; DSUF ¶ 28, Def.'s Mot. Summ. J., Ex. N.)

For the leave of absence in May of 2006, Plaintiff submitted a Request for FMLA leave, along with a Certification of Healthcare Provider dated May 1, 2006. (Pl.'s Mot. Summ. J., Ex. 6.) Plaintiff's supervisor, Darnell Mason, then sent an email to Jennifer Robinson in Human Resources requesting that Plaintiff's time card for May 11, 2006 be changed from unpaid sick leave to FMLA leave. (Pl.'s Mot. Summ. J., Ex. 7.) One hour later, however, Mason sent a second email stating that Plaintiff's time card should be edited to show that sick calls for May 11, 2006 and May 12, 2006 should be changed from FMLA to AWOL (absent without leave). (Id.) Via email dated May 20, 2006, Yvonne Howard indicated that Plaintiff's FMLA leave had not been approved because paperwork had not been submitted and the AWOL was for "no unpaid leave approved." (Pl.'s Mot. Summ. J., Ex. 8.) On May 31, 2006, while Plaintiff's May 12, 2006 FMLA request was pending, an AWOL notice was issued and Plaintiff was scheduled for a disciplinary hearing. (Pl.'s Mot. Summ. J. Ex. 9.) Thereafter, on June 2, 2006, Lucinda West approved Plaintiff for FMLA from May 10, 2006 through May 10, 2007. (Pl.'s Mot. Summ. J., Ex. 10.) The AWOL days were officially changed to FMLA on June 15, 2006. (Pl.'s Mot. Summ. J., Ex. 11.)

During the period in June 2008 when Plaintiff's wife underwent an emergency c-section for the birth of their twins, Plaintiff called out sick for three days claiming that he was ill and provided a doctor's note to that effect. (DSUF ¶ 29; PRSUF ¶ 29; Def.'s Mot. Summ. J., Ex. O.) Plaintiff, however, contends that he only did so because he was instructed by his supervisors to call out sick prior to FMLA approval to avoid being written up for insubordination and sick abuse. (McCall Dep. 146:10–147:9, 173:24–176:9.) He also asserts that Yvonne Howard and Lucinda West instructed him to call out sick. (Id. at 147:10–148:1.) He admitted that he was not really

sick on those particular dates, but was actually out because of his wife. (Id. at 175:7–24.) Plaintiff then verbally requested FMLA leave for June 3 and 4, 2008, when his wife was in the hospital, and provided a doctor's note for her condition. (Def.'s Mot. Summ. J., Ex. O-1.) These dates were subsequently approved by the City. (DSUF ¶ 33; PRSUF ¶ 33.)

Plaintiff also sought future FMLA leave due to his wife's incapacity following the birth of their twins. Plaintiff contends that the medical documentation clearly indicated that Plaintiff's wife was to be incapacitated for a minimum of eight weeks. (PRSUF ¶ 34; Pl.'s Mot. Summ. J., Ex. 14.) The end date for the disabling condition, however, was listed on the form as June 4, 2008, while the duration of needed care was twelve weeks intermittently. (Pl.'s Mot Summ. J., Ex. 14.) As the City was unclear as to the start and end date of Plaintiff's wife's medical condition, Lucinda West requested corrected medical documentation to clarify the precise length of the qualifying medical condition. (Pl.'s Mot. Summ. J., Ex. 14, Def.'s Mot. Summ. J, Ex. P.) Upon receipt of that documentation, the City retroactively approved Plaintiff's requested intermittent FMLA leave. (Def.'s Mot. Summ. J., Ex. Q.)

Notably, however, the three days in June during which Plaintiff called out "sick" were never designated as FMLA leave. (McCall Dep. 153:4–10.) Plaintiff later sought to have those three days reclassified as FMLA leave. He first approached Yvonne Howard in February or March 2009 to request that those days be changed to FMLA, but he did not provide any supporting documentation. Approximately one year later, in March 2010, he, along with his Union representative, went to Yvonne Howard and explained that those three days were protected FMLA leave, but Ms. Howard declined to go back and investigate those days. (McCall Dep. 154:4–155:1.) Via a follow-up email, Ms. Howard explained:

> As discussed Mr. Coleman was provided opportunity to discuss the time that was posted in his payroll record and EAR for 2008 prior to March of 2010. The EAR's and time records are available to employees per their request. In addition, EAR's are distributed to each employee quarterly. They are distributed to employees so that they can bring to the department's attention any discrepancies. The time in the payroll records reflect his call outs, [i]n which the supervisor records the time as requested. Therefore, at this time we will not be able to change Mr. Coleman's unpaid leave time from June 2008.

(Pl.'s Mot. Summ. J., Ex. 42.) Contrary to this refusal to retroactively designate Plaintiff's leave, Christine Derenick-Lopez later testified that "if somebody called out FMLA or called out sick and it really was supposed to be FMLA, if the employee called back and said this was supposed to be FMLA, sure, HR could change that." (Lopez Dep. 92:17–22.)

### D. Plaintiff's Use of Unpaid Leave

On December 31, 2008, Plaintiff received a letter from Yvonne Howard, stating, in relevant part, as follows:

> Payroll records indicate that you have used 16 11/16th unpaid days from January 1, 2008 to December 31, 2008, which excludes unpaid leave concerning Family and Medical Leave. In accordance with Civil Service Regulation 22.05, it is at the discretion of the appointing authority to grant informal leaves of absences without pay (the unpaid leave time you have been using on/between the above-referenced dates).

> Therefore, because you have demonstrated a definitive pattern of using unpaid leave time, **effective January 9, 2009,** the Division of Aviation will **not** permit you to use any additional unpaid leave time, unless you qualify under the Family and Medical Leave Act (FMLA) of 1993 (copy enclosed) and have a qualifying illness. Without such FMLA qualification, you shall be charged with an Unauthorized Absence **(A.W.O.L.)** And progressively disciplined (written warning, suspension without pay, or dismissal—depending on the severity of the infraction) for the following violations: **(A)** Unpaid Sick Leave (with or without a medical certificate), **(B)** Unpaid Late (more than fourteen (14) minutes late), **(C)** Unauthorized Unpaid Leave.

> If you are interested in applying for FMLA, please read the following instructions: [FMLA instructions included]

(Def.'s Mot. Summ. J., Ex. R (emphasis in original).) Yvonne Howard testified that this letter was

generated in part due to the three sick days Plaintiff had called in between June 4, 2008 and June 20, 2008. (Howard Dep. 133:23–135:20.)

On several occasions thereafter, Plaintiff was notified that he was being treated as AWOL since his use of unscheduled time was not approved. (DSUF ¶ 38; PRSUF ¶ 38.) Specifically, on February 28, 2009, Plaintiff called out sick and did not have enough sick leave to cover his shift. (Pl.'s Mot. Summ. J., Ex. 31.) At the subsequent hearing for his AWOL violation, Plaintiff explained that since his FMLA leave was exhausted, being on the No Unpaid Leave list was hard to cope with and he was unable to keep track of his leave usage. (Pl.'s Mot. Summ. J., Ex. 32.) The penalty was nonetheless upheld and Plaintiff was advised that if he committed another AWOL violation, he would be disciplined. (Id.)

Thereafter, Plaintiff received four more AWOL policy violations. On March 18, 2009, Plaintiff was given a two-day suspension. Following a hearing on May 28, 2009, however, that penalty was rescinded. (Pl.'s Mot. Summ. J., Ex. 32.) On August 13, 2009, Plaintiff's car broke down while he was driving to work. (McCall Dep. 87:16–22.) He had his car towed to his residence and then called in and requested that his supervisor Bill Broadnax grant him emergency vacation. (Id.) Broadnax denied that request and issued him an AWOL. (Id.) During the subsequent disciplinary hearing on October 1, 2009, Plaintiff brought in proof of his breakdown and tow truck receipts, but was nonetheless given a two-day suspension. (Pl.'s Mot. Summ. J., Exs. 33, 35; McCall Dep. 89:16–91:22.) Plaintiff appealed that suspension to HR Manager Yvonne Howard and filed grievances against both Broadnax and Human Resources manager Kayla Jones for their conduct at that hearing. (Pl.'s Mot. Summ. J., Ex. 36.) During a second-level grievance hearing on December 4, 2009, Plaintiff's AWOL suspension was rescinded. (Pl.'s

Mot. Summ. J., Exs. 37, 38.)  In a letter dated December 30, 2009, however, Ms. Howard cautioned Plaintiff that he should be mindful of his leave usage and that leave is at the discretion of the department and may be denied regardless of whether a supervisor is called or documentation is submitted.  (Pl.'s Mot. Summ. J., Ex. 38.)  Ms. Howard also stated that Plaintiff "has demonstrated a pattern of unpaid leave usage."  (Id.)

On May 1, 2010, Plaintiff called out sick, but claimed he was unable to see his doctor until May 4, 2010.  (Pl.'s Mot. Summ. J., Exs. 32, 44.)  He provided a doctor's note for this absence. (Id., Ex. 44.)  As later revealed by a March 21, 2013 letter, Plaintiff was seen by Dr. Richard Leavitt for treatment of severe knee pain and depression, "which resulted in an inability to work from May 1, 2010 until the time of his visit."  (Pl.'s Mot. Summ. J., Ex. 45.)  Kayla Jones issued Plaintiff an AWOL notice on May 4, 2010 for his May 1, 2010 absence.  (Pl.'s Mot. Summ. J., Ex. 46.)  Thereafter, on May 12, 2010, she issued a second AWOL notice for Plaintiff's leave on May 5, 2010.  (Id.)  Although Plaintiff signed the May 12, 2010 notice and requested a hearing, he never signed off on the May 4, 2010 notice.  (Pl.'s Mot. Summ. J., Ex. 47.)  On June 24, 2010, while Plaintiff was waiting to go into the AWOL hearing, Jones approached him in the lobby and asked him to sign off on his May 1, 2010 AWOL violation notice.  When he refused, she "verbally assaulted" him in front of other people.  (McCall Dep. 98:12–100:13.)  Thereafter, she allowed the hearing to get "out of control," ended it prematurely, and gave Plaintiff a twelve-day suspension (one two-day suspension and one twelve-day suspension).  (Id. at 89:2–12, 98:12–100:13, 181:16–183:2, Pl.'s Mot. Summ. J., Ex. 48.)  Subsequently, Airport personnel conducted an investigation of Jones's conduct and she was disciplined by Yvonne Howard.  (Pl.'s Mot. Summ. J., Ex. 51; Def.'s Mot. Summ. J., Ex. X.)

On August 19, 2010, Plaintiff filed an Employee Personal Interview Statement with the United States Department of Labor, Wage and Hour Division asserting that his suspension from July 21, 2010 to August 5, 2010 was directly attributed to the misclassification of his June 2008 FMLA leave as uncertified sick leave and that the AWOL charges for February 28, 2009, May 1, 2010, and May 6, 2010 were all FMLA violations. (Pl.'s Mot. Summ. J., Ex. 54.) At some point, the City offered Plaintiff his time back with no restrictions or stipulations, but Plaintiff declined the offer. (Howard Dep. 245:16–23.) Eventually, via an agreement reached between the City and the Department of Labor at a Civil Service Hearing in 2011, Plaintiff was issued a check for the unpaid wages for the workweek ending July 25, 2010 through the workweek ending August 8, 2010. (Pl.'s Mot. Summ. J., Ex. 57.)

### E.      Plaintiff's Separation from City Service

Plaintiff was approved for an unpaid FMLA leave from August 30, 2010 to October 3, 2010, after he submitted medical documentation indicating treatment for severe depression and anxiety. (Def.'s Mot. Summ. J., Ex. T.) His twelve-week entitlement ended on October 3, 2010. (Id.). Due to his ongoing treatment, Plaintiff requested an extension of his leave through January 10, 2011, and provided supporting medical documentation. (Id.) The City approved this request. (Id.) On the last day of his approved leave, Plaintiff contacted the City with a note from his doctor stating that he needed additional unpaid leave through April 5, 2011. (Def.'s Mot. Summ. J., Ex. U, Bates No. 433–34.) The City responded with a letter, dated February 7, 2011, indicating that his request could not be processed "because the condition for which [he was] being treated for [was] not listed on [his] doctor's note and [he] did not complete a submit a leave request (enclosed)." (Id. at Bates No. 431.) The letter further advised him that he had until February 17,

2011 to submit updated medical documentation and a leave request, otherwise he faced separation in accordance with the Civil Service Regulations. (Id.) During a February 17, 2011 conversation between Plaintiff and DeLaine Williams, a Human Resources representative, Plaintiff indicated that he could not have the updated medical documentation until Friday, February 25, 2011. (Id. at Bates No. 430.) The City then confirmed via letter of the same date that, "[s]hould you not submit the updated medical documentation and leave request by February 25, 2011 as you indicated, [you] may be separated in accordance with Philadelphia Civil Service Regulations." (Id.)

On February 25, 2011, Plaintiff sent a letter to the Airport enclosing his request form for his leave. (Id. at Bates No. 426.) He remarked that he was unable to see his doctor that day because the doctor hurt his back, but that he had an appointment scheduled for March 4, 2011. (Id.) He promised to supply the additional information at that time. (Id.) When no additional documentation was received by March 23, 2011, the City sent Plaintiff the following letter:

> Dear Mr. McCall:
>
> You were approved [for] a Medical Leave of Absence from October 3, 2010 to January 10, 2011. Your Medical Leave of Absence expired on January 10, 2011. A letter dated February 7, 2011 was sent requesting additional medical documentation and a leave request by February 17, 2011 to extend your leave of absence. On February 17, 2011, you spoke with DeLaine Williams and stated that you could not have the updated medical documentation until Friday, February 25, 2011. Delaine Williams sent you a letter dated February 17, 2011 confirming this conversation. This office received a fax from you on February 25, 2011 containing the leave of absence request. You stated in your fax that you could not see your doctor until March 4, 2011 to obtain updated medical documentation. This office has tried to reach you by phone and has left messages on March 15, 2011 and March 16, 2011 to find out if you have obtained the necessary documentation. You were informed that if updated medical documentation and leave request was not submitted that you may be separated in accordance with Philadelphia Civil Regulations.
>
> To date, this office has not received the updated medical documentation needed to extend our leave of absence. Please return this information to my attention at the Division of Aviation, Philadelphia International Airport, Human Resources, Terminal

E, Philadelphia PA 19153 or you may fax it to (215) 937-5559. Should you not submit updated medical certification by March 30, 2011, you will be separated from Civil Service employment in accordance with Philadelphia Civil Service Regulations. Please contact me at (215) 937-5550 if you have any questions regarding the leave of absence process or leave status.

(Id. at Bates No. 448.) On that same day, Plaintiff forwarded to the City a letter, dated March 2, 2011, indicating that his psychiatrist, Ira Herman, was out due to emergency back surgery and would not be available for approximately two to three weeks. (Pl.'s Mot. Summ. J., Ex. 77.)

Having not received any further documentation from Plaintiff as of April 5, 2011, Plaintiff was officially separated from the City via letter stating, in pertinent part, as follows:

Dear Mr. McCall:

You were approved a Medical Leave of Absence through January 10, 2011. You were notified on several occasions of your expired leave. The department provided you more than ample time to submit the required paperwork to extend your leave of absence or to return to work. The last due date that you were given to submit paperwork for review was March 30, 2011 . . . .

To date we have not received the information to process an extended leave or clearance to return to duty. As of today you are not on a valid leave of absence, so you have been in unpaid and AWOL from January 11, 2011 to the present. Therefore, in accordance with Philadelphia Civil Service Regulation 22.01 which states "No officer or employee in the Civil Service shall absent himself from duty without leave except in case of sickness or great emergency. An employee who is absent from the service without a valid leave of absence for five consecutive working days shall be deemed to have abandoned his position and to have resigned from the service unless he shall within a period of ten (10) calendar days next succeeding such five (5) days prove to the satisfaction of the Director that such failure was excusable; provided that nothing herein contained shall be construed as preventing an appointing authority from suspending or discharging an employee on account of unauthorized absence" you will be separated from City service. A report of separation will be forwarded under separate cover.

(Def.'s Mot. Summ. J., Ex. U, Bates No. 449.)

F.    **Procedural History**

On September 10, 2010, Plaintiff filed a written Charge of Discrimination against the City

with both the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Rights Commission ("PHRC"). (Third Am. Compl. ¶ 12.) The EEOC issued a Dismissal and Notice of Rights on June 13, 2011, thereby giving Plaintiff ninety days in which to bring federal civil litigation. (Id. ¶ 13.) Plaintiff filed an additional charge of discrimination on June 3, 2011, and on December 21, 2011, the EEOC issued a Dismissal and Notice of Rights. (Id. ¶¶ 15–16.)

Plaintiff initiated the current litigation against Defendant City of Philadelphia, among other divisions of the City, on September 9, 2011. Plaintiff filed an Amended Complaint on December 16, 2011, a Second Amended Complaint on January 26, 2012, and a Third Amended Complaint on March 28, 2011. This latest iteration of the Complaint set forth the following causes of action: (1) retaliation under the Family Medical Leave Act ("FMLA"); (2) violation of the Americans with Disabilities Act ("ADA"); and (3) violation of the Pennsylvania Human Rights Act ("PHRA").

On August 9 and August 12, 2012, Plaintiff and Defendant respectively filed Motions for Summary Judgment. Plaintiff filed his response on September 9, 2012, and Defendant filed its response on September 12, 2012. The Motions are now ripe for judicial consideration.

## II.     STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. Anderson, 477 U.S. at 249–50.

Notably, these summary judgment rules do not apply any differently where there are cross-motions pending. Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008). As stated by the

15

United States Court of Appeals for the Third Circuit, "'[c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" Id. (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)). The court is permitted to resolve cross-motions for summary judgment concurrently. Pa. State Troopers Ass'n v. Miller, 621 F. Supp. 2d 246, 251 (M.D. Pa. 2008). When doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion. Id.

## III.   DISCUSSION

### A.   FMLA Claims

The FMLA was enacted by Congress in 1993 to help address, in part, problems stemming from "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods." 29 U.S.C. § 2601(a)(4). The FMLA was designed to "balance the demands of the workplace with the needs of families" and "entitle employees to take reasonable leave for medical reasons." Id. § 2601(b)(1); see also Callison v. City of Phila., 430 F.3d 117, 119 (3d Cir. 2005) (finding that one of the "primary purposes of the FMLA [is] to 'balance the demands of the workplace with the needs of families'"). The FMLA attempts to accomplish these purposes in a "manner that accommodates the legitimate interests of employers." 26 U.S.C. § 2601(b)(3).

The FMLA guarantees eligible employees of covered employers a total of up to twelve work weeks of leave per twelve-month period due to the birth or adoption of a child, the need to

care for a spouse, son, or daughter because of their serious health condition, or due to the employee's own serious health condition rendering him unable to perform the functions of his position.  Id. § 2612(a)(1).  Following a qualified absence, an employee is entitled to be reinstated to his or her former position or an equivalent position with equal pay, benefits, and other conditions of employment.  Id. § 2614(a)(1).

In the present case, Plaintiff's Motion for Summary Judgment sets forth two claims under the FMLA.  First, he alleges that Defendant interfered with his FMLA benefits, in contravention with the statute, which states that "it shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a)(1).  Second, he claims that he was retaliated against due to his use of FMLA leave.  "This claim arises under 29 U.S.C. § 2615(a)(2), which makes it unlawful for an employer to discriminate against an employee who has taken FMLA leave."  Bearley v. Friendly Ice Cream Corp., 322 F. Supp. 2d 563, 571 (M.D. Pa. 2004).  The Court addresses each claim individually.

### 1.     FMLA Interference Claim

To state a claim for FMLA interference, a plaintiff must allege that: (1) he was an eligible employee under the FMLA; (2) the defendant-employer was subject to the requirements of the FMLA; (3) he was entitled to leave under the FMLA; (4) he gave notice to the defendant of his intention to take FMLA leave; and (5) he was denied the benefits to which he was entitled under the FMLA.  Figueroa v. Merritt Hospitality, LLC, No. Civ.A.11-1807, 2011 WL 4389585, at *3 (E.D. Pa. Sept. 21, 2011) (citations omitted).  As the Third Circuit has explained, "[a]n interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA."  Callison, 430 F.3d at 120.  An

employer interferes with the exercise of FMLA rights by refusing to authorize FMLA leave or denying other benefits or by "discouraging an employee from using such leave." 29 C.F.R. § 825.220(b). "An employer discourages an employee from taking FMLA leave by pressuring the employee to take leave at another time, . . . by proposing the employee work from home instead of taking FMLA leave, . . . or by criticizing an employee for taking too much FMLA leave." Hillborn v. Codaro, No. Civ.A.06-223, 2007 WL 2903453, at *7 (M.D. Pa. Sept. 28, 2007) (internal citations omitted).

In the present case, both Plaintiff and Defendant move for summary judgment as to his claim of FMLA interference. Plaintiff's Motion identifies several actions which allegedly resulted in deprivation of his rights under the FMLA, as follows: (1) Defendant's rejection of the healthcare certification of his doctor in June 2008 deprived him of FMLA approval for eleven days; (2) Yvonne Howard's July 2008 letter and the crew chief's direction instructing him to call out sick to avoid being placed in unpaid status during the pendency of his FMLA approval for his wife's disability jointly interfered with his FMLA rights; and (3) protected FMLA leave was used to show that Plaintiff exceeded the fifteen-day unpaid leave limit set forth by the City's Civil Service Regulations.

Notably, however, Plaintiff has never pled any interference claim, let alone these specific interference claims. Plaintiff's sole count under the FMLA is entitled, "Retaliation Under the FMLA." The ensuing allegations thereafter reflect no allegations involving interference, but rather merely claims of retaliation:

> 166. At all times material thereto, Plaintiff was eligible for Family Medical Leave.
>
> 167. At all times material hereto, Defendants knew or should have known of

18

Plaintiff's need for either continuous or intermittent medical leave for reasons and/or conditions covered by the FMLA;

168. Defendant, Employers, and their agents and/or employees took adverse employment action against Plaintiff in retaliation for exercising his rights under the FMLA.

169. Plaintiff has statutory rights to be free from retaliation under the FMLA which have been intentionally violated by Defendants as follows:
    a.   penalizing Plaintiff for taking FML;
    b.   harassing Plaintiff for taking FML protected time off of work;
    c.   using Plaintiff's time off for FML as the basis of negative employment performance reviews;
    d.   using Plaintiff's time off for FML as the basis of disciplinary actions against Plaintiff;
    e.   using Plaintiff's time off for FML as the basis to deny Plaintiff the ability to accrue, earn, and/or use comp time, or days off to which he would otherwise have been entitled;
    f.   harassing Plaintiff for taking statutorily allowed time off of work for FML;
    g.   constructively discharging Plaintiff for missed time from work
    h.   discharging Plaintiff;
    I.   intentionally trying to aggravate Plaintiff's arthritis
    j.   subjecting Plaintiff to an oppressive and unsafe work environment;
    k.   unlawfully terminating Plaintiff; and
    l.   such other acts as may be adduced through discovery or at trial.

170. As a direct a proximate result of Defendants' retaliation, Plaintiff has in the past incurred, and may in the future suffer a loss of earnings a loss of earning capacity, a loss of benefits, and was discharged from his employment.

171. As a further result of Defendants' conduct, Plaintiff has suffered pain and suffering, upset, mental anguish, humiliation, and embarrassment, loss of life's pleasures and he will continue to suffer same for an indefinite period of time in the future.

172. From 2005 through 2010 Defendants were aware that of Plaintiff's disability and need for FMLA, unpaid leave, and sick leave.

173. All actions taken by the Defendant against the Plaintiff as set forth above constitute violations of Plaintiff's rights under the FMLA and the ADA were continuing violations and were much more than the occurrence of

isolated or sporadic acts.

174. As a further result of Defendants' conduct Plaintiff has incurred attorney's fees and costs.

175. Defendants['] conduct was outrageous and will shock the conscience of this Honorable Court.

(Third Am. Compl. ¶¶ 166–175.)  A thorough reading of the Third Amended Complaint in its entirety reveals no clear allegation that Defendants denied Plaintiff FMLA benefits to which he was entitled.  In fact, the remainder of the Third Amended Complaint simply goes on to repeatedly assert that various supervisors at the Airport became increasingly hostile towards him and committed multiple adverse employment actions against him in "retaliation" for use of FMLA leave.

The pleading requirements of the Federal Rules of Civil Procedure are designed to provide defendants "fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47 (1957), abrogated on other grounds by Bell Atl. v. Twombly, 550 U.S. 544 (2007).  It is well established in the Third Circuit that a plaintiff "cannot raise a new claim in her brief that she has not already pleaded."  Jefferies v. Ameriquest Mortg. Co., 543 F. Supp. 2d 368, 385 (E.D. Pa. 2008); see also Krouse v. Am. Sterilizer Co., 126 F.3d 494, 499 n.1 (3d Cir. 1997) (denying consideration of the plaintiff's claims that were not pleaded in his complaints but were raised on appeal of summary judgment because the defendants did not have "fair notice" of the claims); Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 641–42 (3d Cir. 1993) (affirming the district court's rejection of a disparate impact claim that had not been pleaded and was not raised until after the close of discovery, at the summary judgment stage of a wrongful discharge case); Armbruster v. Unisys Corp., No. Civ.A.91-5948, 1996 WL 55659, at *4 (E.D. Pa.

Feb. 7, 1996) (dismissing a disparate impact claim not raised until summary judgment motions were filed in a disparate treatment case because the disparate impact claim was not alleged in the complaint, discovery had been closed, and defendants would be prejudiced by delayed raising of a new claim). Indeed, federal pleading standards do not allow a party "to raise new claims at the summary judgment stage. . . . Liberal pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of the facts set forth in the complaint." De Wees v. Haste, 620 F. Supp. 2d 625, 635 n.7 (M.D. Pa. 2009).

As aptly noted by Defendant, despite the fact that Plaintiff initiated this litigation in September 2011, Plaintiff did not mention an FMLA interference claim until August 2013—approximately two years later—when he filed his Motion for Summary Judgment. Having filed four separate iterations of the Complaint in this action, none of which even hinted at the invocation of this cause of action, Plaintiff has thus failed to put Defendant on notice that it intended to seek relief under an FMLA interference claim. Although the Third Amended Complaint alleges sporadic facts from which an interference claim *could* have been pled, Plaintiff did not actually plead such a cause of action. Defendant was not required to "infer all possible claims that could arise out of the facts set forth in the complaint." Id. This is particularly true given the fact that Plaintiff mentions the term "interference" only one time in his 189-paragraph complaint and otherwise alleges that all of Defendant's unlawful actions were done in "retaliation" for his FMLA leave.[1] As the lengthy discovery period has long since closed, Defendant is

---

[1] The only reference to "interference" that the Court can locate in the Third Amended Complaint is in paragraph 89, wherein Plaintiff contends that "[s]uch requirements levied by Defendant for Plaintiff to call out sick in the face of a qualifying illness as defined by the Family Medical Leave Act was an interference with Plaintiff's FMLA rights." (Third Am. Compl. ¶ 89.)

precluded from taking any discovery on this cause of action or otherwise testing this theory's liability.

Thus, the court declines to entertain Plaintiff's present arguments for relief under an FMLA interference theory.[2]  Given this undue delay and resulting prejudice from Plaintiff's improper pleading, the Court shall deny Plaintiff's Motion for Summary Judgment and grant Defendant's Motion for Summary Judgment on this ground.

## 2.    FMLA Retaliation Claim

An FMLA retaliation claim arises under 29 U.S.C. § 2615(a)(2), which makes it unlawful for an employer to discriminate against an employee who has taken FMLA leave.  29 U.S.C. § 2615(a)(2).  The FMLA's implementing regulations provide that "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R. § 825.220(c); see also Hofferica v. St. Mary Med. Ctr., 817 F. Supp. 2d 569, 583–84 (E.D. Pa. 2011).  "Retaliation claims are analyzed under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[3]  Bearley, 322 F. Supp.

---

[2]  In any event, an interference claim based on the misclassification of three days in June 2008 would likely be time-barred under either the FMLA's two-year statute of limitations for negligent violations or three-year statute of limitations for willful violations.  29 U.S.C. § 2617(c)(1) & (2). The allegedly improper actions occurred in June 2008, yet Plaintiff did not initiate this litigation until September 2011.

[3]  Where an FMLA plaintiff has direct evidence of retaliation, the standard set forth under Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) applies.  Under the Price Waterhouse framework, "when an FMLA plaintiff alleging unlawful termination presents direct evidence that his FMLA leave was a substantial factor in the decision to fire him, the burden of persuasion on the issue of causation shifts, and the employer must prove that it would have fired the plaintiff even if it had not considered the FMLA leave." Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 147 (3d Cir. 2004); see also Hofferica, 817 F. Supp. 2d at 584.  As our Court of Appeals has explained, to constitute direct evidence, "the evidence must be such that it

2d at 571.  To prevail on a claim of discrimination or retaliation based on FMLA leave, a plaintiff

must show that: "(1) he took an FMLA leave, (2) he suffered an adverse employment decision, and

(3) the adverse employment decision was causally related to his leave."  Conoshenti v. Public

Serv. Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004).  After establishing a prima facie case, the

burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse

employment action, i.e., that it would have taken the same action irrespective of the plaintiff's

FMLA leave.  Bearley, 322 F. Supp. 2d at 571.  If the employer offers a legitimate,

nondiscriminatory reason, the burden is shifted back to plaintiff to establish that the employer's

reasons are pretextual.  Id.

In the present case, neither party disputes that Plaintiff took FMLA leave, thereby

satisfying the first element of the prima facie case.  In addition, as discussed below, the Court finds

that Plaintiff has put forth sufficient evidence to establish that he suffered an adverse employment

decision and that that adverse employment action was arguably related to his FMLA leave.  As

such, under the burden-shifting framework, the Court must then determine whether Defendant has

a legitimate, non-discriminatory reason for its actions and, if so, whether Plaintiff has established

pretext.

---

demonstrates that the 'decisionmakers placed substantial negative reliance on an illegitimate
criterion in reaching their decision.'"  Walden v. Georgia-Pacific. Corp., 126 F.3d 506, 513 (3d
Cir. 1997) (quoting Price Waterhouse, 490 U.S. at 277).
    Although Plaintiff argues that he has direct evidence in support of his FMLA interference
claim, his Motion for Summary Judgment with respect to his retaliation claim applies the burden-
shifting framework described above.  (Pl.'s Mem. Supp. Mot. Summ. J. 63–64.)  Moreover, this
Court finds no direct evidence that Defendant retaliated against—i.e., disciplined Plaintiff—for
use of FMLA leave.  This case thus requires application of the McDonnell-Douglas burden-
shifting test.

a.        **Adverse Employment Actions**

In 2006, the Supreme Court refined the definition of an "adverse employment action" in

Burlington N. & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006), providing that alleged

retaliatory actions are "materially adverse" if they would "dissuade[ ] a reasonable worker from

making or supporting a charge of discrimination."[4] Id. at 57.  Such inquiries are to be made on a

case-by-case basis and "an act that would be immaterial in some situations is material in others."

St. John v. Potter, No. Civ.A.09–4196, 2011 WL 780685, at *8 (E.D. Pa. Mar. 4, 2011) (internal

quotations and further citation omitted), aff'd, 474 F. App'x 80 (3d Cir. 2012). While the inquiry

is context-specific, "petty slights, minor annoyances, and simple lack of good manners . . . will not

normally constitute materially adverse employment actions, even if they follow protected

conduct."  Id. (quoting Burlington, 548 U.S. at 69).

"It is clear that an unpaid suspension—under most circumstances— rises to the level of a

materially adverse employment action because 'it well might [dissuade] a reasonable worker from

making or supporting a charge of discrimination.'"  Prise v. Alderwoods Grp., Inc., No. Civ.A.06-

1470, 2011 WL 3047629, at *7 (W.D. Pa. July 25, 2011) (quoting Dodd v. SEPTA, No.

Civ.A.06–4213, 2008 WL 2902618, at *14 (E.D. Pa. July 24, 2008) (quoting Burlington, 548 U.S.

at 72–73)).  Repeatedly, courts have found that a retaliatory suspension could rise to the level of a

materially adverse action.  See, e.g., Moore v. Shinseki, No. Civ.A.10-4463, 2011 WL 5075164, at

---

[4] Although Burlington was a Title VII retaliation case, the Third Circuit has recognized
that (1) the same definition of an "adverse employment action" applies to retaliation claims under
the ADA, see Griffin v. De Lage Landen Fin. Serv., Inc., 219 F. App'x 245, 247 n.1 (3d Cir.
2007); and (2) ADA and FMLA claims are analyzed according to the same legal standard.  Ozlek
v. Potter, 259 F. App'x 417, 423 n.5 (3d Cir. 2007).

*7 (E.D. Pa. Oct. 25, 2011) (holding that a fourteen-day suspension without pay would dissuade a reasonable worker from making a discrimination charge and, thus, would constitute an adverse employment action), aff'd, 487 F. App'x 697 (3d Cir. 2012); Klopfenstein v. Nat'l Sales & Supply, LLC, No. Civ.A.07–4004, 2008 WL 2331948, at *5 (E.D. Pa. June 5, 2008) (agreeing that a suspension can amount to an adverse employment action), aff'd, 323 F. App'x 129 (3d Cir. 2009); Davis v. Mothers Work, Inc., No. Civ.A.04–3943, 2005 WL 1863211, at *4 n.8 (E.D. Pa. Aug. 4, 2005) (holding plaintiff's retaliatory suspension could rise to the level of a materially adverse action where the plaintiff allegedly lost wages as a result of these actions); Satterfield v. UPS, No. Civ.A.00–7190, 2003 WL 22251314, at *13 (S.D.N.Y. Sept. 30, 2003) ("[P]laintiff arguably has shown that she was subjected to an adverse employment action when she was suspended, presumably without pay, for one day in March 1999."); Parkinson v. Anne Arundel Med. Ctr., Inc., 214 F. Supp. 2d 511, 518 (D. Md. 2002) ("Plaintiff's one-day, unpaid suspension . . . could constitute an adverse employment action."), aff'd 79 F. App'x 602 (4th Cir. 2003).

In the present case, Plaintiff suffered multiple adverse employment actions.[5]  Both parties agree that Plaintiff was issued five AWOL violations for his absences of February 28, 2009, March 18, 2009, August 13, 2009, May 1, 2010, and May 6, 2010.  The charge of February 28, 2009 was upheld.  Although the charges of March 18, 2009 and August 13, 2009 were rescinded, this action was taken following full hearings during which Plaintiff was required to appear and defend

---

[5]  Plaintiff does not claim that his ultimate termination from employment with the City in April 2011 was in retaliation for his use of FMLA.

himself.[6]  Moreover, the two-week suspension for the May 1, 2010 and May 6, 2010 charges was

upheld and Plaintiff was reimbursed only after he had already been terminated from the City's

employment, and only after the City reached a settlement with the United States Department of

Labor.  As these suspensions had a material effect on the terms and conditions of his employment,

the Court deems them sufficient to satisfy the second prong of the FMLA retaliation standard.[7]

---

[6]  Several courts have concluded that proposed or rescinded terminations do not constitute
an adverse employment action.  Gonzalez v. Potter, No. Civ.A.09-534, 2010 WL 2196287, at *6
(W.D. Pa. June 1, 2010) (citing Russ–Tobias v. Pa. Bd. of Probation and Parole, No.
Civ.A.04–0270, 2006 WL 516771, at *25 (E.D. Pa. Mar. 2, 2006) ("[T]he rescinded transfer
does not constitute an adverse employment action because . . . it was rescinded before she was
forced to change assignments."); McMillan v. Potter, 130 F. App'x 793, 797 (6th Cir. 2005)
(finding the only consequence of a proposed suspension letter "is humiliation, a consequence
insufficient to enable [plaintiff] to meet the adverse employment action requirement."); Walker
v. Wash. Metro. Area Transit Auth., 102 F. Supp. 2d 24, 29 (D.D.C. 2000) ("It bears
emphasizing that [defendant] rescinded the disciplinary notice shortly after it was issued.")).  In
this case, however, not all of Defendant's suspensions were rescinded and, as a result, he suffered
suspensions and loss of pay.

[7]  Defendant suggests that any claim for retaliatory actions relating to the handling of the
three days in question in June 2008 is time-barred under the FMLA's two-year statute of
limitations.  Since the current action was filed in September 2011, Defendant argues that any
AWOL violations issued prior to September 2009 should be deemed time-barred (assuming the
Court does not find evidence of willful violations which would invoke the three-year statute of
limitations).
    Under the continuing violation doctrine, however, "'when a defendant's conduct is part of
a continuing practice, the action is timely so long as the last act evidencing the continuing
practice falls within the limitations period.'"  Cowell v. Palmer Twp., 263 F.3d 286, 292 (3d Cir.
2001) (quoting Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am., 927 F.2d
1283, 1295 (3d Cir. 2001)).  In determining whether a plaintiff has shown a continuing practice
of retaliation, the plaintiff must show that all acts which constitute its claim are part of the same
unlawful employment practice and that at least one act falls within the applicable limitations
period.  Mandel v. M&Q Packaging Corp., 706 F.3d 157, 165–66 (3d Cir. 2013).
    In the present case, the five AWOL violations all constitute the same type of retaliation.
Moreover, Plaintiff suffered all five occurrences within an approximate fourteen-month time
period, the last of which was in May 2010.  Plaintiff's complaint was filed within two years from
the date of those last violations.  Given this continuing pattern, the Court concludes that
Plaintiff's FMLA claim based on these actions is not time-barred.

b.      **Causation**

The third element of a prima facie case of FMLA retaliation requires a showing of a causal connection between the Plaintiff's protected activity and an action that might have dissuaded a reasonable worker from making or supporting a charge of discrimination.  Moore v. City of Phila., 461 F.3d 311, 341–42 (3d Cir. 2006).  To determine whether a plaintiff has met the causation element, the court must consider all evidence that is "potentially probative of causation."  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000).  Temporal proximity between the protected activity and the employer action may indicate causation, but "'the mere fact that adverse employer action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events.'"  Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997)).

"[I]n cases where temporal proximity is not 'unusually suggestive' of retaliatory motive, the Third Circuit has demanded further evidence to substantiate a causal connection."  McCloud v. United Parcel Serv., Inc., 543 F. Supp. 2d 391, 401–02 (E.D. Pa. 2008).  "Such other evidence may include, but is not limited to, a 'pattern of antagonism' by the employer that could link the adverse action with Plaintiff's complaint."  Id.  The Third Circuit has specifically remarked that absent the unduly suggestive temporal proximity, a causal link between protected activity and adverse action may be inferred from "an intervening pattern of antagonism following the protected conduct, or the proffered evidence examined as a whole."  Peace-Wickham v. Walls, 409 F. App'x 512, 522 (3d Cir. 2010).

Plaintiff's causation case rests on the theory that his use of FMLA in June 2008, in

27

conjunction with the birth of his twins, resulted in the ensuing rash of adverse employment actions and culminated in his twelve-day suspension. Specifically, he asserts that the three days he called in sick should have been counted as protected FMLA leave, but were not. He further contends that the subsequent AWOL charges, AWOL hearings, and AWOL suspensions were directly attributable to Plaintiff's use of FMLA in June 2008 because his three allegedly "misclassified days" caused him to be repeatedly put on the unpaid leave abuse list. In turn, Plaintiff avers that his supervisors and Defendant's HR representatives consistently ignored his medical excuses for his absences and treated him with bias and hostility, despite his efforts to explain that all of the discipline was due to the misclassification of his FMLA leave.

Undoubtedly, the issue of whether the three days of Plaintiff's leave in June 2008 were misclassified as "sick" time, rather than FMLA leave, is the proper subject of an FMLA interference claim—a claim which has not been pled as part of this action. Nonetheless, a question still remains with respect to the subsequent actions and whether they were taken in retaliation for Plaintiff's general use of FMLA time in June 2008 or whether they were appropriate disciplinary actions based on Plaintiff's abuse of the leave policy. Plaintiff testified that, in June 2008, he called out sick only at his supervisors' direction to protect himself and his job. When he explained that he was really out on FMLA leave to care for his wife—FMLA time that was actually approved by the City—Defendant did not attempt to investigate. Instead, the City repeatedly used those three days to find Plaintiff in violation of leave without pay policies and subject him to repeated AWOL disciplines for time that he would otherwise have been allowed to take. These disciplines were accompanied by a hostility and a lengthy period of antagonism from his supervisors including threats of firing, refusals to grant him leave time for emergencies, and comments about

his abuse of leave. For example, Plaintiff sets forth multiple incidents of antagonism seemingly related to his leave from various employees of the Airport, as follows:

*Bill Broadnax*

- Broadnax became hostile and started yelling at Plaintiff during an October 1, 2009 meeting relating to discipline due to an AWOL violation. (McCall Dep. 86:7–19. Broadnax had written Plaintiff up for an AWOL, when Plaintiff claims he had called in for an emergency vacation day due to car troubles. (Id. at 87:16–22.) Broadnax called the tow truck driver who supposedly helped Plaintiff with his problem and Plaintiff received a two day suspension. (Id. at 91:18–92:24.) Plaintiff filed a grievance with his union and the suspension was subsequently rescinded. (Id. at 94:5–95:24.)

- On numerous occasions, Broadnax said "he was going to get rid of [Plaintiff], verbally assaulted him, threatened to write him up, and came close to physically assaulting him. (Id. at 64:18–23.) During one period when the City was planning to lay off 3,000 workers, Broadnax "looked [Plaintiff] right in the face" and told him that he had to put a list together of people to be laid off. (Id. at 141:14–142:3.) Plaintiff did not get laid off. (Id. at 142:4–5.)

- Broadnax would give Plaintiff directions that required him to walk long distances in the Airport terminals, despite knowing of Plaintiff's difficulty walking. (McCall Dep. 139:22–140:20, 159:18–160:20.)

- Broadnax denied Plaintiff a vacation day for his wedding anniversary. (Id. at 142:18–143:8.)

- On October 4, 2009, Broadnax asked Plaintiff to sign a performance evaluation that had been changed from the evaluation originally completed by Plaintiff's crew chief. (DSUF ¶ 42(h); PRSUF ¶ 42(h).) The new report gave Plaintiff several unsatisfactory ratings. Plaintiff alleges that Broadnax told him the revised ratings were due to his absenteeism and based on a specific chart. (McCall Dep. 179:10–180:15.) That performance review is missing.

*Yvonne Howard*

- Howard drafted a letter, dated December 31, 2009, reprimanding Plaintiff for his unpaid leave and placed that letter in his personnel file. (Def.'s Mot. Summ. J., Ex. R.)

- Howard would not allow him to use four hours of available vacation time when he

called out sick but did not have enough sick time to cover his eight-hour shift in February 2009. This resulted in a written warning for an AWOL violation. (McCall Dep. 71:12–73:2.)

- In February 2009, at the written warning hearing, Howard stated to Plaintiff in front of his crew chief and numerous others that she was "going to curb [his] behavior." (Id. at 164:18–21.)

- Even after Plaintiff's AWOL violation for August 13, 2009 was rescinded at a hearing, Ms. Howard drafted a letter to Plaintiff's union representative, and placed a copy in his file that, in part, cautioned Plaintiff for his continued leave usage. (Pl.'s Mot. Summ. J., Ex. 38.)

*Darnell Mason*

- Mason either wrote Plaintiff up for AWOL violations or signed off on AWOL violations originated by Broadnax. (DSUF ¶ 44(a); PRSUF ¶ 44(a).)

- Mason prevented Plaintiff from earning comp time. Mason allegedly told Plaintiff that he did no approve him for comp time because he knew Plaintiff was going to use it. According to Plaintiff, Mason knew Plaintiff needed the comp time to manage his disability. (McCall Dep. 93:21–94:15, 133:6–134:7.)

- Mason commented about Plaintiff "always having to take time off" after Plaintiff's father died in December 2007, his uncle died shortly after, and his children were born in June 2008. (Id. at 143:9–24.)

- Mason consistently told Plaintiff that he was going to get rid of him because they needed people that came to work. (Id. at 144:12–18.)

- Mason refused to allow Plaintiff to be trained on snow plows because he thought Plaintiff needed to come to work more, even though he knew of Plaintiff's disability and even though Plaintiff had seniority. (Id. at 150:23–151:16.)

- During a meeting about Plaintiff's AWOL violations, Mason referenced time that Plaintiff took for legitimate reasons and exaggerated the amount of emergency vacation time that Plaintiff used. (Id. at 145:4–146:18.)

- In June 2010, Mason insisted that Plaintiff sign off on an AWOL write up and threatened him with insubordination if he did not sign it. (Id. at 148:3–149:6.) The union representative ended up signing it. (Id.)

*Christine Derenick-Lopez*

- Plaintiff argues that Ms. Lopez had the power to investigate and stop all of the problems with his unfair write-ups for AWOL violations and alleged harassment by supervisors, but did not do so. (Id. at 113:7–114:6.)

- Lopez did not take the time to investigate the allegations against Plaintiff. (Id. at 114:7–18.)

*Kayla Jones*

- Jones failed to control the hearing at which Broadnax became aggressive toward Plaintiff. (Id. at 89:2–12.)

- Jones gave him a twelve-day suspension for two AWOL violations without proper notice or a proper hearing. (Id. at 98:12–100:13, 181:16–183:2.)

- On June 24, 2010, while Plaintiff was waiting to go into the AWOL hearing, Jones approached him in the lobby and asked him to sign off on his May 1, 2010 AWOL violation notice. When he refused, she verbally assaulted him in front of other people. (Id. at 98:12–100:13.) Jones was subsequently disciplined by Yvonne Howard after Airport Personnel investigated this incident. (Def.'s Mot. Summ. J., Ex. X.)

*Sandy Lanier*

- On one occasion, Plaintiff's car was blocked in by a snow storm and Mason approved him for a vacation day. Lanier, however, said that he needed Plaintiff there, even though Plaintiff could not work outside, and that he was sending someone to pick Plaintiff up. (McCall Dep. 128:15–130:19.) No one was ever sent to pick him up. (Id. at 130:20–21.)

Notably, a substantial number of these actions specifically implicate Plaintiff's use of leave, whether it be FMLA leave or sick leave, thus suggesting an antagonistic attitude towards Plaintiff for his use of such leave. "[W]hen analyzing whether a plaintiff has established causation in a retaliation case, a court should ask whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference' of causation." Hofferica, 817 F. Supp. 2d at 585 (quoting Farrell, 206 F.3d at 280). Bearing that standard in mind and taking Plaintiff's allegations as true, the Court must find that Plaintiff has sufficiently raised such an inference of causation, requiring this Court

to deem the prima facie case satisfied.

### c.      Legitimate Non-Discriminatory Reason and Pretext

Upon establishing a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action. Bearley, 322 F. Supp. 2d at 571. If the employer offers such a legitimate, nondiscriminatory reason, the burden shifts back to plaintiff to establish that the employer's reasons are pretextual. Id.

In the present matter, Defendant offers an objective explanation for its treatment of the three days at issue in June 2008 as sick leave, rather than FMLA. Defendant contends that on those three days in question, which occurred between the time of Plaintiff's initial request for FMLA leave on June 3, 2008 and the City's approval of the request on June 20, 2008, Plaintiff called in sick and actually provided doctor's notes stating that he was absent from work due to his *own* illness, not that of his wife. (Def.'s Mot. Summ. J., Ex. O.) Plaintiff admitted that he did so even though he was actually caring for his wife and family. (DSUF ¶¶ 29–32; PRSUF ¶¶ 29–32.) Accordingly, the City properly classified those three days as sick time rather than FMLA time. Moreover, Plaintiff did not approach Yvonne Howard with his claim that these days should be changed to FMLA days until February or March of 2009—when he first realized that those days were counted toward the finding that he had exceeded fifteen days of unpaid leave in calendar year 2008, excluding FMLA. (Def.'s Mot. Summ. J., Ex. R.) He did not, however, provide documentation to support his contention until another full year later, in March 2010. At that juncture, Howard declined to change his time due to the lapse in time and because Plaintiff had sufficient opportunity prior to March of 2010 to bring this to her attention. (Pl.'s Mot. Summ. J., Ex. 42.) According to Defendant, the AWOL violations that occurred after the June 2008 period

were, therefore, all legitimate violations of Defendant's leave policies.

Plaintiff, on the other hand, argues that this argument is nothing more than pretext. He claims that he was directly instructed to call out sick by both his supervisors. This instruction was confirmed by a June 10, 2008 letter from Lucinda West, regarding his request for FMLA leave, which stated in part:

> This letter is to confirm receipt of the written request and the Certification of Health Care Provider for your wife from 11/19/07 to 06/04/08. However, this leave request cannot be processed until the enclosed Certification form is completed by your physician and returned by 06/20/08. Once the Certification form is received a determination will be made and you will be notified of your eligibility.
>
> Until the Certification is received and you have received notice of a determination *continue to adhere to the call out procedure. Failure to submit documentation for our absence is a violation of the Sick Leave Policy* (see enclosed). Should you not submit the Certification form for your Family Medical Leave of Absence requested you may be subject to disciplinary action.

(Def.'s Mot. Summ. J., Ex. P (emphasis added).) During her deposition, Ms. West acknowledged that although her letter was not intended to suggest that an employee seeking FMLA leave call in sick, there were "pitfalls" in its wording. (West Dep. 62:13–63:1.) She further conceded that "if someone doesn't have the time to call out sick, doesn't have vacation time, and doesn't have any other time on the books and the crew chiefs tell him to call out sick because of that letter that he could be unpaid status and be disciplined." (Id. at 63:5–12.) Upon the designation of Plaintiff's time, the three days at issue were unfairly used to show that he exceeded the fifteen-day limit on unpaid leave. This, in turn, resulted in the various disciplines being issued. (Howard Dep. 252:1–253:3.) In turn, Plaintiff claims that he suffered retaliation as a direct result of his use of FMLA leave, which was exacerbated by Howard's failure to investigate Plaintiff's claims and to retroactively designate the three days as FMLA leave, despite the fact that the FMLA allows for

retroactive designation.  See 29 C.F.R. § 825.301(d).[8]

Considering the foregoing in conjunction, it becomes abundantly obvious that resolution of this case is for a factfinder and not for a Court on summary judgment review.  Clearly, Defendant has offered a legitimate, non-discriminatory reason for its actions towards Plaintiff that, if believed, would absolve the City of any liability for FMLA retaliation.  Plaintiff, on the other hand, has pointed out weaknesses, implausibilities, and inconsistencies in Defendant's explanation—albeit through inconclusive evidence—such that a reasonable factfinder could rationally find that explanation unworthy of credence.  Should a factfinder determine that Defendant misclassified some of Plaintiff's FMLA leave as sick time, it could then find that reliance on that classification as justification for issuing subsequent AWOL violations was nothing more than pretext to retaliate against Plaintiff for use of FMLA leave.

Crediting either of these equally reasonable findings is not within this Court's province during the summary judgment phase.  The only proper resolution of this dispute—particularly in the face of such conflicting evidence—is for each party to tell its story via live witnesses, documents, and cross-examination.  Only at that juncture can a factfinder evaluate which story withstands the tests of credibility.  Given the remaining genuine issues of material fact, the Court shall deny both Motions for Summary Judgment on the FMLA retaliation claim.

---

[8]  This section states that "[i]f an employer does not designate leave as required by § 825.300, the employer may retroactively designate leave as FMLA leave with appropriate notice to the employee as required by § 825.300 provided that the employer's failure to timely designate leave does not cause harm or injury to the employee.  In all cases where leave would qualify for FMLA protections, an employer and an employee can mutually agree that leave be retroactively designated as FMLA leave."  29 C.F.R. § 825.301(d).

**B.     ADA and PHRA[9] Claims**

Both parties also move for summary judgment on Plaintiff's claims under the Americans

With Disabilities Act ("ADA").  The ADA was enacted in 1990 to "prevent otherwise qualified

individuals from being discriminated against in employment based on a disability."  Gaul v.

Lucent Techs. Inc., 134 F.3d 576, 579 (3d Cir.1998) (citing 29 C.F.R. pt. 1630, app. at 347-48

(1997)).  Under the ADA, employers are prohibited from "discriminat[ing] against a qualified

individual with a disability because of the disability of such individual in regard to job application

procedures, the hiring, advancement, or discharge of employees, employee compensation, job

training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  A

"qualified individual with a disability" is defined under the ADA as "an individual with a

disability who, with or without reasonable accommodation, can perform the essential functions of

the employment position that individual holds or desires."  42 U.S.C. § 12111(8).

Plaintiff now contends that Defendant committed multiple violations of the ADA as

follows: (1) improper medical inquiry into a medical condition; (2) hostile work environment

based on his disability; and (3) failure to accommodate and to engage in the interactive process.[10]

---

[9]  Although they are not bound to do so, Pennsylvania courts generally interpret the PHRA in accord with its federal counterparts, including the ADA.  Salley v. Circuit City Stores, Inc., 160 F.3d 977, 979 n.1 (3d Cir. 1998) (citing Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996)). This is due in part to the substantial similarity between the definition of "handicap or disability" under the PHRA and the definition of "disability" under the ADA.  Id. (citing Fehr v. McLean Packaging Corp., 860 F. Supp. 198, 200 (E.D. Pa. 1994)).  The Third Circuit has held that a claim under the PHRA is coextensive with a claim under the ADA.  Id. (citing Kelly, 94 F.3d at 105). Accordingly, the Court addresses the ADA and PHRA claims jointly.

[10]  Plaintiff only moves for summary judgment as to the first claim.  Defendant moves for summary judgment as to all of these claims.

The Court addresses each claim individually.

### 1.    Prohibited Medical Inquiry

Plaintiff first alleges that by demanding information about his medical condition while he was on FMLA leave in 2011, Defendant engaged in a prohibited medical inquiry in derogation of the ADA, 42 U.S.C. § 12112(d)(4)(A).  Upon review, the Court finds no merit to this claim.

Section 12112(d)(4) prohibits an employer from "requir[ing] a medical examination . . . [or] mak[ing] inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability unless such examination or inquiry is shown to be job-related and consistent with business necessity."  See 42 U.S.C. § 12112(d)(4)(A). This provision was enacted in order "'to prevent the administration to employees of medical tests or inquiries that do not serve a legitimate business purpose.'"  Ward v. Merck & Co., Inc., No. Civ.A.04-5996, 2006 WL 83114, at *8 (E.D. Pa. Jan. 9, 2006) (quoting Equal Employment Opportunity for Individuals With Disabilities, 56 Fed. Reg. 35,726, 35,750 (July 26, 1991)), aff'd 226 F. App'x 131 (3d Cir. 2007).  To establish a prima facie case under § 12112(d)(4), the plaintiff must demonstrate that (1) the plaintiff is an employee of the defendant and (2) that the policy either requires a medical examination or requires disclosure of information regarding a disability or that "may tend to reveal a disability."  Conroy v. N.Y. State Dep't of Corr. Servs., 333 F.3d 88, 95 (2d Cir. 2003); see also Green v. Joy Cone Co., 278 F. Supp. 2d 526, 538 (W.D. Pa. 2003) (holding that a non-disabled plaintiff may challenge an employer's policy requiring medical examinations and inquiries).  A policy that requires the employee to provide a general diagnosis or description of a medical condition constitutes a prohibited inquiry under § 12112(d)(4).  Conroy, 333 F.3d at 95; Pa. State Troopers Ass'n v. Miller, 621 F. Supp. 2d 246, 251–52 (M.D. Pa. 2008).

Plaintiff contends that, on January 10, 2011, DeLaine Williams, a Human Resources representative at the Airport, sent him a letter advising that his leave of absence had expired and that he should contact her with any questions about the leave of absence process or returning to duty. (Pl.'s Mot. Summ. J., Ex. 69.) On that same date, Plaintiff faxed Ms. Williams a letter seeking an extension of his unpaid leave of absence and attaching a note from his psychiatrist that stated, "I re-evaluated Coleman today. His condition stemming from Job related problems continues to be unimproved. He is unable to work at least through April 4, 2011." (Pl.'s Mot. Summ. J., Ex. 70.) The City responded, on February 7, 2011, that his request could not be processed "because the condition for which [he was] being treated for [was] not listed on [his] doctor's note and [he] did not complete a submit a leave request (enclosed)." (Def.'s Mot. Summ. J., Ex. U.) The letter further advised him that he had until February 17, 2011 to submit updated medical documentation and a leave request, otherwise he faced separation in accordance with Civil Service Regulations. (Id.) During a February 17, 2011 conversation between Plaintiff and Ms. Williams, Plaintiff indicated that he could not have the updated medical documentation until Friday, February 25, 2011. (Id.) The City then confirmed via letter of the same date that, "Should you not submit the updated medical documentation and leave request by February 25, 2011 as you indicated, [you] may be separated in accordance with Philadelphia Civil Service Regulations." (Id.) Following several similar back-and-forth discussions, during which Plaintiff repeatedly promised that he would get the requested information, (id.), the City officially separated Plaintiff from employment on April 5, 2011. Plaintiff now contends that the inquiry into his medical condition was a violation of § 12112(d)(4)(A) of the ADA.

The Court finds this claim meritless. "'[O]nce an employee exceeds the duration of her

protected leave, the employer is not obligated by FMLA to keep open the position or to reinstate the employee upon her return.'" Hofferica, 817 F. Supp. 2d at 577 (quoting Keim v. Nat'l R.R. Passenger Corp., No. Civ.A.05-4338, 2007 WL 2155656, at *6 (E.D. Pa. Jul 26, 2007). Thus, "[a]n employer may not terminate an employee because he or she has taken the leave permitted by the statute. If the employee is not able to return to work after twelve weeks, however, the employer may terminate the employee." Katekovich v. Team Rent A Car, Inc., 36 F. App'x 688, 690 (3d Cir. 2002). Accordingly, once a plaintiff exhausts FMLA leave, a request for an extended leave of absence is a request for a "reasonable accommodation" pursuant to the ADA. "[R]egular attendance at work is an essential function of employment. . . . While allowing a medical leave of absence might, in some circumstances, be a reasonable accommodation, . . . [a]n employer is not required by the ADA . . . to provide an unlimited absentee policy." Brannon v. Luco Mop Co., 521 F.3d 843, 849 (8th Cir. 2008).

The regulations interpreting the ADA specifically recognize that "[e]mployers are obligated to make reasonable accommodation only to the physical or mental limitations resulting from the disability of an individual with a disability that is known to the employer. . . . When the need for an accommodation is not obvious, an employer, before providing a reasonable accommodation, may require that the individual with a disability provide documentation of the need for accommodation." 29 C.F.R. Pt. 1630, App. § 1630.9. The EEOC has elaborated on this provision to explain that, "[t]he employer is entitled to know that the individual has a covered disability for which s/he needs a reasonable accommodation. . . . An employer may require that the documentation about the disability and the functional limitations come from an appropriate health care or rehabilitation professional. The appropriate professional in any particular situation will

depend on the disability and the type of functional limitation it imposes." See EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship under the Americans with Disabilities Act, at 6 http://www.eeoc.gov/policy/docs/accommodation.html#; see also Cody CIGNA Healthcare of St. Louis, Inc., 139 F.3d 595, 599 (8th Cir. 1998) ("Employers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims under §§ 12112(a) and 12102(2)(C).")

In the present case, Plaintiff had fully exhausted his twelve-week FMLA leave by October 3, 2010. Accordingly, he sought unpaid leave from the City pursuant to Civil Regulation 22.02. This provision states that:

> The appointing authority, subject to the approval of the Director, may grant a leave of absence without pay for a period not exceeding one year, to an employee upon the employee's written request. Such leave, however, may, for meritorious reasons, be extended for additional periods with the approval of the appointing authority and the Director. *The employee's written request shall state the duration of the requested leave and the reason for the request. Medical documentation shall accompany requests for medical leaves.* If a leave request is denied and such denial will have the effect of causing the employee's separation from City service, the employee shall be notified in writing that his/her request has been denied and that he/she may appeal such action to the Civil Service Commission within (30) days.

(Def.'s Mot. Summ. J., Ex. C (emphasis added).)[11] Plaintiff's original request for extended leave,

---

[11] To the extent Plaintiff argues that the City's regulations requiring medical documentation are facially invalid under § 12112(d)(4), the Court deems the cases cited in support to be inapposite. In both Pennsylvania State Troopers Association v. Miller, 621 F. Supp. 2d 246, 256 (M.D. Pa. 2008) and EEOC v. Dillard's, Inc., No. Civ.A.08-1780, 2012 WL 440887 (S.D. Cal. Feb. 9, 2012), the courts considered whether sick leave policies that required employees to disclose the nature of their illness when requesting sick leave—even for a day or two—violated the ADA. In the present case, Plaintiff did not simply request a brief sick leave—he sought to extend an medical leave of absence on which he had already been out for six months and for which he had no further sick time or FMLA leave. Indeed, the Court in Miller expressly recognized that "[a]n employer may implement a broad inquiry after several weeks' leave if the length of absence gives the employer a reasonable basis to question the employee's

made in October 2010, included such documentation in the form of a doctor's note indicating simply that Plaintiff had received treatment for "depression and anxiety related to job stressors," that he had been seeing a psychiatrist monthly, and that he was unable to perform his work duties at that time. (Def.'s Mot. Summ. J., Ex. T.) The City accepted such documentation as sufficient and granted the extended leave.

At the close of this extended leave period, however, Plaintiff again requested an extension of time. The City noted, however, that the doctor's note submitted by Plaintiff failed to indicate what medical condition was causing his inability to return to work. Accordingly, the City was unable to determine whether Plaintiff had a "disability" that required accommodation. Therefore, it requested updated medical documentation that indicated his condition; it did not flatly deny his request for leave.[12] Moreover, at no point did it make a "medical inquiry," require Plaintiff to disclose his full medical history or medical files, or mandate that Plaintiff undergo a medical examination. Rather, it simply wanted documentation in order to process an extended leave of absence. Plaintiff never objected to submitting this documentation, but rather repeatedly promised to provide it upon getting in touch with his physician. Indeed, from early February 2011 to early April 2011, Plaintiff made numerous promises that he would provide the documentation—actions

_____

ability to perform his or her job duties. A broad inquiry, however, is inappropriate at the outset of illness when the employer has little reason to doubt the employee's fitness." Miller, 621 F. Supp. 2d at 259.

[12] As set forth above, Dr. Herman's January 11, 2011 note stated that, "His condition stemming from Job related problems continues to be unimproved." Plaintiff argues that Defendant could have ascertained what the "condition" was simply by referring to Dr. Herman's October 2010 note that indicated that Plaintiff was being treated for anxiety and depression. This argument is of no moment. Whether the documentation was sufficient to indicate his condition, however, is irrelevant to whether Defendant was entitled to make the inquiry in the first place.

completely inconsistent with his current claim. Only after Plaintiff neither provided the documentation nor returned to work did the City terminate his employment. Such actions do not violate § 12112(d)(4)(A) of the ADA. The Court, therefore, grants summary judgment in favor of Defendant on this claim.

### 2. Failure to Accommodate

In order for a plaintiff to establish a prima facie failure to accommodate case under the ADA, he must demonstrate that: (1) he had a disability; (2) the employer had notice of this disability; (3) he can perform the essential functions of his position with a reasonable accommodation; and (4) the employer failed to provide a reasonable accommodation. Johnson v. McGraw-Hill Cos., 451 F. Supp. 2d 681, 701 (W.D. Pa. 2006). The ADA "requires only that an employer make a reasonable accommodation to the known physical or mental disability of a qualified individual with a disability unless the employer can show that the accommodation would impose an undue hardship on the employer." Conneen v. MBNA America Bank, N.A., 334 F.3d 318, 329 (3d Cir. 2003). Although the statute itself makes no reference to an "interactive process," the interpreting regulations state that "[t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). In order for a plaintiff to hold his employer responsible for a breakdown in the interactive process, he must show that: (1) the employer knew about his disability; (2) he requested accommodations or assistance for his disability; (3) the employer did not make a good faith effort to assist him in seeking

accommodations; and (4) he could have been reasonably accommodated but for his employer's lack of good faith. <u>Johnson</u>, 451 F. Supp. 2d at 701 (citing <u>Conneen</u>, 334 F.3d at 330–331). Numerous courts have recognized that leave of absence for medical treatment may constitute a reasonable accommodation under the ADA. <u>Shannon v. City of Phila.</u>, No. Civ.A.98-5277, 1999 WL 1065210, at *5 (E.D. Pa. Nov. 23, 1999) (citing cases). A leave of absence for an indefinite period of time, however, is not a reasonable accommodation, particularly where the employee presents no evidence of expected duration or a favorable prognosis. <u>Id.</u>

Plaintiff argues that Defendant failed to accommodate both his knee condition and his depressive disorder. Defendant responds that it provided all reasonable accommodations requested.[13] As these conditions involve different time periods and different types of alleged failure to accommodate, the Court addresses them separately.

### a. <u>Knee Disorder</u>

As to his knee disorder, the Court finds Plaintiff's claim meritless. As set forth above, the City gave Plaintiff regular accommodations to manage this disability. On October 28, 2005, Plaintiff submitted a note from his doctor asking that he be allowed to use a ride-on burnisher rather than one that required him to walk behind it. (DSUF ¶ 20; PRSUF ¶ 20; Def.'s Mot. Summ. J., Ex. M.) The City accommodated his request. (<u>Id.</u>) In addition, the City approved Plaintiff for light duty for a period of time, (McCall Dep. 77:10–15), and gave him days off for medical treatment. (<u>Id.</u> at 78:9–12.) Indeed, prior to 2009, Plaintiff had always submitted requests for accommodations with documentation and, once he requested them, they were approved. (Howard

_____

[13] Defendant does not dispute either that Plaintiff had a disability or that the City had notice of the disability.

Dep.131:1–20.)

To the extent Plaintiff now argues that the City should have accommodated him by allowing him to use additional unpaid leave days, his claim must fail. At his deposition, Plaintiff admitted that after Ms. Howard's letter in January 2009, he did not request an ADA accommodation of additional time,[14] despite the fact that he had previously made requests for accommodations in the past and knew the process. (McCall Dep. 83:2–15.) He explained that there was "no need" to request an accommodation "because it was something that was given to each and every employee as part of the civil service regulations." (Id. at 77:16-78:3.) Although Plaintiff contends that his supervisors were aware of his condition for his knees, he neglects to establish that he was not afforded time to manage that condition. (Id. at 84:16–85:17.) Indeed, after Ms. Howard's letter, but prior to his leave for his depression, Plaintiff was granted FMLA leave intermittently between August 12, 2009 and October 9, 2009, and was given his normal sick time, vacation time, and leave without pay to manage his disability. (Def.'s Mot. Summ. J., Ex. N; DSUF ¶ 26; PRSUF ¶ 26.) Although Plaintiff received AWOL violations on February 28, 2009 and March 18, 2009, and August 13, 2009, Plaintiff presents no evidence that any of these days were related to his knees and, in fact, admits that the August 13, 2009 call out was due to car troubles. Moreover, with respect to the latter two violations, the City actually granted Plaintiff

---

[14] "A plaintiff's request for accommodation, leave time, or other assistance must be made in good faith to be a protected activity. Even though the law doesn't require a set of 'magic words,' the plaintiff 'must make clear that [he] wants assistance.'" Butler v. BTC Foods, Inc., No. Civ.A.12-492, 2012 WL 5315034, at *4 (E.D. Pa. Oct. 19, 2012).

emergency vacation time and rescinded any penalty.[15]

In light of these facts, the Court does not find that Plaintiff has established any genuine issue of material fact as to whether the City failed to accommodate him with respect to his knee condition. The record reflects that, since his original diagnosis, the City offered numerous accommodations in terms of his work responsibilities, his requisite FMLA leave, and other days off in the form of sick, vacation, and unpaid leave. Plaintiff expressly admits that he never requested additional time off as an accommodation to help him manage his disability since he simply presumed that time was due to him.[16] Moreover, he fails to show any occasion where he asked for time off specifically for his knee problem and was not ultimately granted that time. Finally, the record is devoid of any evidence that, had he made a request for reasonable accommodation of his knee condition in the form of additional time, the City would not have approved it. Accordingly, no reasonable factfinder could find that Plaintiff requested accommodation in the form of additional leave to manage his disability or that the City did not make a good faith effort in trying to assist him. In turn, summary judgment on this claim must be granted.

---

[15] In his Response to Defendant's Motion for Summary Judgment, Plaintiff argues that "[t]he City could have afforded McCall a disability leave on multiple occasions including 2-29-10, 6-14-10, 7-1-10, and 4-5-11." (Pl.'s Resp. Opp'n Summ. J. 79.) The record, however, does not reflect that Plaintiff either took or requested leave time on those particular days. Plaintiff makes no effort to explain how these dates are otherwise relevant.

[16] As set forth above, whether or not Plaintiff was actually entitled to additional time off in the form of FMLA leave and whether the City retaliated against him for use of FMLA time to which he was entitled remains at issue. That, however, is an entirely different question than whether the City failed to accommodate his disability.

### b. Depressive Disorder

With respect to Plaintiff's depressive disorder, the merits of Defendant's position are even clearer. As explained in great detail above, Plaintiff had been approved for an unpaid FMLA leave from August 30, 2010 to October 3, 2010, after he submitted medical documentation supporting his depression and anxiety. (Def.'s Mot. Summ. J., Ex. T.) In light of his ongoing treatment, Plaintiff requested an extension of his leave through January 10, 2011, and provided supporting medical documentation. (Id.) Despite the fact that Plaintiff had exhausted his FMLA entitlements, the City accommodated his disability and approved this request. (Id.) On the last day of his approved leave, Plaintiff contacted the City seeking additional unpaid leave through April 5, 2011. (Def.'s Mot. Summ. J., Ex. U, Bates No. 433–34.) The City responded that his request could not be processed "because the condition for which [he was] being treated for [was] not listed on [his] doctor's note and [he] did not complete a submit a leave request (enclosed)." (Id. at Bates No. 431.) The City further advised him that he had until February 17, 2011 to submit updated medical documentation and a leave request. (Id.) Nothing in this letter suggests that Plaintiff was being denied extended leave.

Repeatedly thereafter, Plaintiff promised to provide the requested documentation. Indeed, on no less than four occasions, the City provided Plaintiff extensions of time in which to provide the promised information. Only on April 5, 2011—approximately *four months* after his already extended leave had ended and after Plaintiff failed to follow through on his multiple promises to supply documentation that would support a further extension—the City terminated him. There is no indication in the record that had Plaintiff provided the requested information, the City would not have granted his extended leave. Moreover, it is notable that the City waited until April 5,

45

2011 to terminate Plaintiff, as this was the date provided by his doctor in his last note of January

10, 2011. Accordingly, the City effectively granted the requested the extended leave. Only when

Plaintiff failed to show either indications of returning to work or an ability to return to work did

the City terminate his employment.

"It is utterly unreasonable and not within the mandate of the ADA to expect an employer to

accommodate an employee with an indefinite leave of absence." Reifer v. Colonial Intermediate

Unit 20, 462 F. Supp. 2d 621, 636 (M.D. Pa. 2006). Plaintiff had already been out on extended

leave—non-FMLA leave—for six months. Despite repeated efforts by the City, via mail and

phone, to obtain updated medical documentation establishing a need for further accommodation,

Plaintiff simply failed to comply. Certainly, the ADA requires nothing more of the employer.

Accordingly, the Court grants summary judgment on this claim as well.

### 3. Hostile Work Environment

The final ADA claim at issue alleges that Plaintiff was subjected to a hostile work

environment because of his disability. To state a prima facie hostile work environment claim

under the ADA, a plaintiff must allege that (1) he is a qualified individual with a disability; (2) he

was subject to unwelcome harassment; (3) the harassment was based on his disability or request

for an accommodation; (4) the harassment was sufficiently severe and pervasive to alter the

conditions of his employment and to create an abuse working environment; and (5) the employer

knew or should have know of the harassment and failed to take prompt effective remedial action.

Walton v. Mental Health Ass'n of Se. Pa., 168 F.3d 661, 667 (3d Cir. 1999); see also Sconfienza

v. Verizon Pa . Inc., 307 F. App'x 619, 623 (3d Cir. 2008). Since a plaintiff must show harassing

behavior "sufficiently severe or pervasive to alter the conditions of [the victim's] employment," a

plaintiff cannot rely upon casual, isolated, or sporadic incidents to support his claim of hostile work environment harassment.  See Howard v. Blalock Elec. Serv., Inc., 742 F. Supp. 2d 681, 692 (W.D. Pa. 2010).  Conduct that is merely offensive or which has the effect of making an employee's life at work unpleasant or uncomfortable is, without more, not actionable.  Harris v. Forklift Sys., 510 U.S. 17, 21–22 (1993).

Additionally, mistreatment that is not motivated by the plaintiff's protected class, but rather by a bad working relationship or mistaken belief of insubordination does not create a hostile work environment.  Gharzouzi v. Nw. Human Servs. of Pa., 225 F. Supp. 2d 514, 534 (E.D. Pa. 2002).  In other words, "the Americans with Disabilities Act does not make all harassment, or every unpleasant working environment, actionable under the law.  Rather, to constitute a hostile work environment under the ADA, the harassing conduct must be *because of* the plaintiff's disability."  Barclay v. Amtrak, 435 F. Supp. 2d 438, 448–49 (E.D. Pa. 2006) (emphasis in original).

Defendant does not contest that Plaintiff was a qualified individual with a disability under the ADA.  Nor does Defendant dispute that Plaintiff was subject to unwelcome harassment.  Rather, it argues that (a) the harassment was not based on his disability or request for an accommodation and (b) the harassment was not sufficiently severe and pervasive to alter the conditions of Plaintiff's employment and to create an abuse working environment.

In response, Plaintiff contends that the repeated imposition of discipline upon him while he was on the No Unpaid Leave List, without any accommodation or interaction as to his disability, created a hostile work environment.  Specifically, Plaintiff lists the following actions as establishing a hostile work environment:

- Yvonne Howard telling Plaintiff that the City would curb his behavior for

using unpaid leave that he used to manage his disability;

• Terminating his unpaid leave in 2006, 2008, and 2009, when the City knew he had to use unpaid leave to manage his disability;

• Violating, on two occasions, internal policies regarding his FML leave calculation;

• Violating internal policies regarding progressive discipline on June 24, 2010 and July 1, 2010;

• Failing to investigate claims that Kayla Jones was biased against him when the City knew that she would be hostile and unfair during disciplinary hearings;

• Refusing to interact with him prior to denying him leave, because Howard expected him to state his medical condition on his sick notes—something the City's own sick leave policy did not require;

• Refusing to timely remedy: (a) the misclassification of FML days as sick days; (b) termination of his unpaid leave use; (c) the discipline happening to him, all of which impacted on his need to take leave for his orthopedic disability;

• Threatening to call the police on June 24, 2010 and suspending him without any hearing whatsoever after being told that he missed work on 5/1/10 due to his knees;

• Refusing to hold his ten day suspension in abeyance as suggested by Jones and ordering service of his 2-day AWOL on July 1, 2010 (i.e., after his ten day suspension was already adjudicated, in violation of the City's policy of progressive discipline);

• Failing to render aid of any type by way of apology or otherwise, for the June 24, 2010 incident;

• Failing to notify the union that McCall was on unpaid leave knowing that he was depressed and required medication for his depression, denying him holiday leave and overtime and comp time which he could have used to obtain additional time to manage his need to be off from work 1–2 days per month;

• Failing to take any action when Dr. Leavitt requested on 10-5-10 that the

City restore McCall's medical benefits, and reduce his stress at work;

- Terminating McCall's Medical Leave of Absence by requiring him to provide a statement of medical diagnosis when the City's Leave of Absence policy does not require such a statement and believing that she could use the FMLA to justify her request;

- Failing to warn him of his right to appeal his termination of the denial of his Unpaid Medical Leave of Absence to the Civil Service Commission as required by the Civil Service Rules;

- Issuing letters that labeled him unfairly as an abuser of leave which were used as a negative factor used to denying him leave when required for his disability;

(Pl.'s Resp. Opp'n Mot. Summ. J. 71–73.)

Assuming *arguendo* that such allegations rise to the level of severe and pervasive harassment, Plaintiff's hostile work environment claim fails in establishing the third element, i.e., that the harassment was based on his disability or request for an accommodation. The Court finds guidance in two cases. First, in Walton v. Mental Health Association for Southeastern Pennsylvania, 168 F.3d 661 (3d Cir. 1999), the Third Circuit rejected the notion that any time a supervisor harasses an employee for absences allegedly caused by a disability, that such conduct constitutes harassment *because* of the employee's disability. The plaintiff in that case suffered from depression and took numerous extended absences presumably because of her disability. Id. at 664. The Third Circuit, however, rejected such a broad view of hostile work environment under the ADA. The plaintiff claimed that her supervisor subjected her to a hostile work environment on the basis of her disability by, among other things, (1) calling plaintiff ten days consecutively at a time when she was hospitalized, asking each day when she would be returning to work, and (2) telling plaintiff she would be fired if she did not attend a work-related event that she had received

permission not to attend.  Id. at 667.  The Third Circuit, however, held that the plaintiff had "not

asserted facts that would allow a reasonable jury to find that [her supervisor] harassed her because

of her disability. . . .  The fact that [the supervisor]'s behavior toward Walton may have been

offensive does not indicate that it was based on Walton's disability."  Id.

Similarly, in  Barclay v. Amtrak, 435 F. Supp. 2d 438 (E.D. Pa. 2006), aff'd, 450 F. App'x

505 (3d Cir. 2007), the plaintiff brought an ADA hostile work environment claim.  The court

remarked that, "[w]hen viewed as a whole, the record in this case does not reflect that Barclay was

harassed because of his disability, i.e., because of his irritable bowel syndrome . . . .  Rather, the

testimony of Barclay and several of his former co-workers indicates that Palumbo and the other

supervisors' treatment of Barclay was motivated by several other factors, most significantly

Barclay's excessive absenteeism."  Id. at 449.  Citing Walton, the court also rejected the notion

that harassment of an employee for absences that the employee claims were caused by a disability

per se constitutes disability-based harassment.  Id.  Ultimately, the court found that, "[t]he ADA

does not protect an employee from every kind of harassment, but only from harassment that is

based on the employee's disability or request for accommodation."  Id. at 450.

Simple review of the evidence cited by Plaintiff in this case reveals that he was not

subjected to any harassment or hostility based on either of his actual disabilities— his knee

impairment or his depressive and anxiety disorders.  Indeed, Plaintiff's knee disorder was

diagnosed sometime in 2003, and the City offered him multiple accommodations through at least

2008.  The alleged hostility began only after Plaintiff took FMLA leave related to his children's

birth in June 2008, and had three days purportedly misclassified as unpaid leave instead of FMLA

time.  What followed was a consistent disciplining of Plaintiff for use of excessive unpaid leave

time to which Plaintiff believed he was entitled.  At least one of the absences for which Plaintiff

was disciplined was entirely unrelated to any disability and, on two other occasions, Plaintiff failed

to establish that his absences were related to any of his documented disabilities.  At no point,

according to the record, was Plaintiff denied leave time related to his disability when properly

documented.  In fact, when Plaintiff actually requested an accommodation in the form of extended

leave to obtain ongoing treatment for severe depression and anxiety, the City granted that leave

first from October 3, 2010 to January 10, 2011, and again—to allow Plaintiff to supply

documentation supporting his need for even more leave time—from January 10, 2011 to April 5,

2011.[17]

Nothing in Plaintiff's cited list of "harassment" suggests that any of the alleged animus

towards Plaintiff was motivated by the fact of his disability.  Likewise, the record presented by

Plaintiff does not indicate that the alleged hostile actions were taken based on his request for

accommodation.  Rather, Plaintiff's list of "adverse actions" conflates the proof for his FMLA

---

[17]  Plaintiff's analogy to <u>Lowenstein v. Catholic Health East</u>, 820 F. Supp. 2d 639 (E.D. Pa. 2011) is of no moment.  In that case—which was decided on a motion to dismiss—the plaintiff averred that she made earnest efforts to comply with her employer's sick leave requirements, but was nonetheless disciplined repeatedly and eventually terminated.  <u>Id.</u> at 647. The plaintiff had received warnings for at least six absences in a nine-month period, even though her employer knew about her medical condition.  <u>Id.</u>  Moreover, plaintiff had provided multiple doctors' notes, but her employer rejected them all as "unacceptable."  <u>Id.</u>

In the present case, Defendant did not have a similarly inflexible sick leave policy. Indeed, Defendant repeatedly granted Plaintiff leave when he documented his absences with explanatory doctors' notes.  On the occasions when Plaintiff was disciplined, he admittedly had either not provided a doctor's note or had the penalty rescinded after a proper doctor's note was provided.  Moreover, unlike in <u>Lowenstein</u>, Plaintiff has not put forth any evidence that he requested time off as an accommodation for his disability.  Given the record before the Court, the only reasonable inference is that the repeated disciplines were due to use of leave—be it FMLA leave or leave to which Plaintiff was not entitled—and not due to disability or request for accommodation.

retaliation claim with the proof for a hostile work environment claim under the ADA. Taking Plaintiff's recitation of facts as true, each and every citation of hostility by Plaintiff in his Response brief clearly indicates that the animus towards Plaintiff was as a result of his excessive absenteeism.

In light of this discussion, the Court must grant summary judgment in favor of Defendant on Plaintiff's claim of hostile work environment under the ADA. Although Plaintiff could arguably show that he was subjected to severe and pervasive hostile treatment that altered the conditions of his employment, he fails to establish that any reasonable trier of fact could find that such treatment was motivated by his disability or request for accommodation. Accordingly, the Court grants judgment on this claim in favor of Defendant.

## IV. CONCLUSION

For all of the foregoing reasons, the Court denies Plaintiff's Motion for Summary Judgment in its entirety and grants Defendant's Motion in part and denies it in part. Plaintiff has failed to meet his burden of establishing an entitlement to summary judgment on any of his claims. Defendant, on the other hand, has proven that Plaintiff's FMLA interference claim is waived and that Plaintiff's ADA claims are meritless. This Court, however, finds that a genuine issue of material fact remains as to whether the numerous disciplines that Plaintiff received at the hands of Defendant were motivated either by Plaintiff's use of FMLA leave or by Defendant's allegedly improper characterization of Plaintiff's FMLA leave as unpaid sick leave. The case is, therefore, limited to this singular claim of FMLA retaliation. A date for trial on this discrete issue shall be set at the status conference hereafter scheduled.

An appropriate Order follows.