**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

COLEMAN MCCALL, JR.                :
                                   :        CIVIL ACTION
                Plaintiff,         :
                                   :
        v.                         :
                                   :        NO.  11-5689
CITY OF PHILADELPHIA,              :
                                   :
                Defendant.         :

**MEMORANDUM**

BUCKWALTER, S. J.                                    February 25, 2014

Currently pending before the Court is the Motion for Judgment on the Pleadings or,

alternatively, for Summary Judgment by Defendant City of Philadelphia ("Defendant" or "City").

For the following reasons, the Motion is granted in part and denied in part.

I.      **FACTUAL BACKGROUND**[1]

The present litigation involves a claim by Plaintiff against the City under the anti-

retaliation provisions of the Family and Medical Leave Act, 29 U.S.C. § 2601, et seq. ("FMLA"),

the Americans With Disability Act of 1990, as amended, 42 U.S.C. §§ 1211, et seq. ("ADA"),

and the Pennsylvania Human Relations Act, 647 Pa.C.S § 951, et seq. ("PHRA").

A.      **The City's Relevant Employment Policies and Civil Service Regulations**

Civil Service Regulation 22.01 provides as follows:

22.01 – GENERAL PROVISIONS.   No officer or employee in the Civil Service

---

[1]  The Court takes this statement of facts verbatim from the previous Memorandum and Order issued in this case on October 29, 2013, wherein the Court granted in part and denied in part Defendant's Motion for Summary Judgment.  McCall v. City of Phila., No. Civ.A.11-5690, 2013 WL 5823873 (E.D. Pa. Oct. 29, 2013).

shall absent himself from duty without leave except in case of sickness or great emergency.

An employee who is absent from the service without a valid leave of absence for five consecutive working days shall be deemed to have abandoned his position and to have resigned from the service unless he shall within a period of ten (10) calendar days next succeeding such five (5) days prove to the satisfaction of the Director that such failure was excusable; provided however, that nothing herein contained shall be construed as preventing an appointing authority from suspending or discharging an employee on account of unauthorized absence.

(Def.'s Mot. Summ. J., Ex. C.)  Regulation 22.02 goes on to state:

22.02 – LEAVES OF ABSENCE WITHOUT PAY, GRANTING OF.  The appointing authority, subject to the approval of the Director, may grant a leave of absence without pay for a period not exceeding one year, to an employee upon the employee's written request.  Such leave, however, may, for meritorious reasons, be extended for additional periods with the approval of the appointing authority and the Director.  The employee's written request shall state the duration of the requested leave and the reason for the request.  Medical documentation shall accompany requests for medical leaves.  If a leave request is denied and such denial will have the effect of causing the employee's separation from City service, the employee shall be notified in writing that his/her request has been denied and that he/she may appeal such action to the Civil Service Commission within (30) days.

(Id.)  Finally, Regulation 22.05 provides:

22.05 – INFORMAL LEAVES OF ABSENCE WITHOUT PAY NOT TO EXCEED FIFTEEN (15) WORKING DAYS.  The appointing authority may, at his discretion, grant to employees upon their request informal leaves of absence, without pay, not to exceed fifteen (15) working days.  Such leaves of absence do not require the approval of the Director and the granting of such leaves of absence without pay need not be reported to the Personnel Department.

(Id.)

In addition, the City maintains a City-wide sick leave policy, which sets forth requirements for obtaining and taking sick leave.  (Def.'s Mot. Summ. J., Ex. D.)  This policy affords paid leave for all permanent Civil Service employees, including eleven paid holidays, vacation based on years of service, administrative leave days, sick leave, and funeral leave.  (Id.)

2

The Philadelphia Airport itself, where Plaintiff worked, also maintains a sick leave policy specifically for Airport employees, (Def.'s Mot. Summ. J., Ex. E), as well as a policy on unpaid leave. (Def.'s Mot. Summ. J., Ex. F.) Notably, none of these policies require employees or their physicians to identify a medical condition on a sick leave notice. (Def.'s Mot. Summ. J., Exs. D, E, & F.) Nonetheless, Yvonne Howard, the Airport's Human Resources Director, testified that when a medical leave of absence is applied for, the employee must submit medical documentation indicating what the leave is for, the duration of time, and a written request from the employee and approval from the manager and the Human Resources office. (Def.'s Mot. Summ J., Ex. W, Dep. of Yvonne Howard ("Howard Dep.") 153:22–154:6, July 12, 2012.) All of these policies are included in a booklet entitled, "The Family and Medical Leave Act: Guidelines for City of Philadelphia Employees." (Def.'s Mot. Summ. J., Ex. I.) Plaintiff signed a form on March 30, 2001, indicating receipt of this booklet. (Id.)

Before August of 2009, supervisors approved the use of unpaid time leave with little or no guidance. (Def.'s Mot. Summ. J., Ex. H, Dep. of Christine Derenick-Lopez ("Lopez Dep."), 61:21–62:62:5, Nov. 26, 2012.) As a result, Christine Derenick-Lopez, the Assistant Director of Aviation for the City, went through several meetings with the local union and ultimately issued an August 28, 2009 memorandum clarifying the use of unpaid leave. (Derenick-Lopez Dep. 63:7–64:4.) The memorandum indicated that, in accordance with Civil Service Regulation 22.05, the "appointing authority **may, at his discretion,** grant to employees upon their request informal leaves of absence, without pay, not to exceed fifteen (15) working days." (Def.'s Mot. Summ. J., Ex. G (emphasis in original).) She further explained that, effective September 7, 2009, the Division of Aviation would evaluate all requests for unpaid leave and decisions would

3

be made on a case-by-case basis, considering documentation of an emergency, grave illness, or disabling injury; the employee's attendance, work, and disciplinary histories; previous unpaid leave status; and the impact of the unpaid leave on the Division of Aviation.  (Id.)  Finally, the memorandum noted that "[t]he exceptions to the use of unpaid leave include: eligible employees with a qualifying condition under the Family and Medical Leave Act, and Military Leave of Absence."  (Id.)  Ms. Lopez testified that there was no ADA impact study done relative to this memorandum.  (Lopez Dep.  85:10–17.)

From 2007 through 2009, Lucinda West (formerly Lucinda Goss) handled administration of FMLA leave.  (Def.'s Mot. Summ. J., Ex. J, Dep. of Lucinda West ('West Dep.") 15:6–11, Nov. 9, 2012.)  She was trained in the handling of FMLA matters.  (Id. at 16:9–18:22, Def.'s Mot. Summ. J., Ex. K.)  She explained that she could only approve FMLA leave if an employee provided a proper medical reason.  (West Dep. 18:23–19:4.)

**B.**    **Plaintiff's Employment With the City and ADA Accommodations**

From April 17, 2000 until April 5, 2011, Plaintiff Coleman McCall was employed with Defendant City of Philadelphia as a "Custodial Worker 1" at the Airport.  (Def.'s Statement of Undisputed Facts ("DSUF") ¶ 1; Pl's Resp. to Defendant's Statement of Undisputed Facts ("PRSUF") ¶ 1.)  Custodial workers were responsible for the cleaning and maintenance of the Airport.  (Def.'s Mot. Summ. J., Ex. A, Dep. of Coleman McCall ("McCall Dep."), 49:4–7, Apr. 25, 2013; Def.'s Mot. Summ. J., Ex. B.)

Sometime in 2003, Plaintiff was diagnosed with severe bilateral knee arthritis and degenerative joint disease.  (DSUF ¶ 17; PRSUF ¶ 17.)  In both 2003 and 2005, Plaintiff sought accommodations from the City in the form of work modifications and documented his need for

4

those accommodations with medical support.  (DSUF ¶ 18; PRSUF ¶ 18.)  On each occasion, the

City approved Plaintiff's request and granted the accommodations.  (Id.)  Specifically, on

October 28, 2005, Plaintiff submitted a note from his doctor asking that he be allowed to use a

ride-on burnisher rather than one that required him to walk behind it.  (DSUF ¶ 20; PRSUF ¶ 20;

Def.'s Mot. Summ. J., Ex. M.)  When the City requested more detailed medical documentation,

Plaintiff provided additional information from his doctor.  (DSUF ¶¶ 21–22; PRSUF ¶¶ 21–22;

Def.'s Mot. Summ. J., Ex. M.)  By way of a letter dated November 11, 2005, the City

accommodated his request for the ride-on burnisher.  (Id.)  In addition, the City approved

Plaintiff for a period of light duty, (McCall Dep. 77:10–15), and gave him extra days off for

medical treatment.  (Id. at 78:9–12.)  Plaintiff also depended highly on his fifteen allotted unpaid

leave days per year to manage his disability.  (Id. at 74:22–11.)  During Plaintiff's employment

with the City, he remained able to perform the essential functions of his position with reasonable

accommodations, despite his knee conditions.  (DSUF ¶ 19; PRSUF ¶ 19.)

    **C.**    **Plaintiff's Use of FMLA Leave**

    During his tenure with the City, Plaintiff used FMLA leave numerous times for his knee

condition, his depressive disorder, and other authorized reasons.  (DSUF ¶ 26; PRSUF ¶ 26.)

Specifically, Plaintiff used FMLA for six days' leave in 2002; from September 21, 2004 to

October 21, 2004; from May 6, 2005 to July 11, 2005; from March 3, 2006 to May 3, 2006;

intermittently between May 10, 2006 and May 10, 2007, and June 4, 2008 and July 12, 2008;

from August 28, 2008 to November 28, 2008; intermittently between August 12, 2009 and

October 9, 2009; and from August 11, 2010 to October 2, 2010.  (Def.'s Mot. Summ. J., Ex. N;

DSUF ¶ 26; PRSUF ¶ 26.)  In addition, Plaintiff used FMLA leave in December 2006 due to the

death of his father, (DSUF ¶27; PRSUF ¶ 27), and intermittently from June 4, 2008 to August 27, 2008 due to the premature birth of his twin children.  (DSUF ¶ 28; DSUF ¶ 28, Def.'s Mot. Summ. J., Ex. N.)

For the leave of absence in May of 2006, Plaintiff submitted a Request for FMLA leave, along with a Certification of Healthcare Provider dated May 1, 2006.  (Pl.'s Mot. Summ. J., Ex. 6.)  Plaintiff's supervisor, Darnell Mason, then sent an email to Jennifer Robinson in Human Resources requesting that Plaintiff's time card for May 11, 2006 be changed from unpaid sick leave to FMLA leave.  (Pl.'s Mot. Summ. J., Ex. 7.)  One hour later, however, Mason sent a second email stating that Plaintiff's time card should be edited to show that sick calls for May 11, 2006 and May 12, 2006 should be changed from FMLA to AWOL (absent without leave).  (Id.) Via email dated May 20, 2006, Yvonne Howard indicated that Plaintiff's FMLA leave had not been approved because paperwork had not been submitted and the AWOL was for "no unpaid leave approved."  (Pl.'s Mot. Summ. J., Ex. 8.)  On May 31, 2006, while Plaintiff's May 12, 2006 FMLA request was pending, an AWOL notice was issued and Plaintiff was scheduled for a disciplinary hearing.  (Pl.'s Mot. Summ. J. Ex. 9.)  Thereafter, on June 2, 2006, Lucinda West approved Plaintiff for FMLA from May 10, 2006 through May 10, 2007.  (Pl.'s Mot. Summ. J., Ex. 10.)  The AWOL days were officially changed to FMLA on June 15, 2006.  (Pl.'s Mot. Summ. J., Ex. 11.)

During the period in June 2008 when Plaintiff's wife underwent an emergency c-section for the birth of their twins, Plaintiff called out sick for three days claiming that he was ill and provided a doctor's note to that effect.  (DSUF ¶ 29; PRSUF ¶ 29; Def.'s Mot. Summ. J., Ex. O.) Plaintiff, however, contends that he only did so because he was instructed by his supervisors to

call out sick prior to FMLA approval to avoid being written up for insubordination and sick abuse.  (McCall Dep. 146:10–147:9, 173:24–176:9.)  He also asserts that Yvonne Howard and Lucinda West instructed him to call out sick.  (Id. at 147:10–148:1.)  He admitted that he was not really sick on those particular dates, but was actually out because of his wife.  (Id. at 175:7–24.)  Plaintiff then verbally requested FMLA leave for June 3 and 4, 2008, when his wife was in the hospital, and provided a doctor's note for her condition.  (Def.'s Mot. Summ. J., Ex. O-1.)  These dates were subsequently approved by the City.  (DSUF ¶ 33; PRSUF ¶ 33.)

Plaintiff also sought future FMLA leave due to his wife's incapacity following the birth of their twins.   Plaintiff contends that the medical documentation clearly indicated that Plaintiff's wife was to be incapacitated for a minimum of eight weeks.  (PRSUF ¶ 34; Pl.'s Mot. Summ. J., Ex. 14.)  The end date for the disabling condition, however, was listed on the form as June 4, 2008, while the duration of needed care was twelve weeks intermittently.  (Pl.'s Mot Summ. J., Ex. 14.)  As the City was unclear as to the start and end date of Plaintiff's wife's medical condition, Lucinda West requested corrected medical documentation to clarify the precise length of the qualifying medical condition.  (Pl.'s Mot. Summ. J., Ex. 14, Def.'s Mot. Summ. J, Ex. P.)  Upon receipt of that documentation, the City retroactively approved Plaintiff's requested intermittent FMLA leave.  (Def.'s Mot. Summ. J., Ex. Q.)

Notably, however, the three days in June during which Plaintiff called out "sick" were never designated as FMLA leave.  (McCall Dep. 153:4–10.)  Plaintiff later sought to have those three days reclassified as FMLA leave.  He first approached Yvonne Howard in February or March 2009 to request that those days be changed to FMLA, but he did not provide any supporting documentation.  Approximately one year later, in March 2010, he, along with his

Union representative, went to Yvonne Howard and explained that those three days were

protected FMLA leave, but Ms. Howard declined to go back and investigate those days.  (McCall

Dep. 154:4–155:1.)  Via a follow-up email, Ms. Howard explained:

> As discussed Mr. Coleman was provided opportunity to discuss the time that was
> posted in his payroll record and EAR for 2008 prior to March of 2010.  The EAR's
> and time records are available to employees per their request.  In addition, EAR's are
> distributed to each employee quarterly.  They are distributed to employees so that
> they can bring to the department's attention any discrepancies.  The time in the
> payroll records reflect his call outs, [i]n which the supervisor records the time as
> requested.  Therefore, at this time we will not be able to change Mr. Coleman's
> unpaid leave time from June 2008.

(Pl.'s Mot. Summ. J., Ex. 42.)  Contrary to this refusal to retroactively designate Plaintiff's leave,

Christine Derenick-Lopez later testified that "if somebody called out FMLA or called out sick

and it really was supposed to be FMLA, if the employee called back and said this was supposed

to be FMLA, sure, HR could change that."  (Lopez Dep. 92:17–22.)

### D.   **Plaintiff's Use of Unpaid Leave**

On December 31, 2008, Plaintiff received a letter from Yvonne Howard, stating, in

relevant part, as follows:

> Payroll records indicate that you have used 16 11/16th unpaid days from January 1,
> 2008 to December 31, 2008, which excludes unpaid leave concerning Family and
> Medical Leave.  In accordance with Civil Service Regulation 22.05, it is at the
> discretion of the appointing authority to grant informal leaves of absences without
> pay (the unpaid leave time you have been using on/between the above-referenced
> dates).

> Therefore, because you have demonstrated a definitive pattern of using unpaid leave
> time, **effective January 9, 2009,** the Division of Aviation will **not** permit you to use
> any additional unpaid leave time, unless you qualify under the Family and Medical
> Leave Act (FMLA) of 1993 (copy enclosed) and have a qualifying illness.  Without
> such FMLA qualification, you shall be charged with an Unauthorized Absence
> **(A.W.O.L.)** And progressively disciplined (written warning, suspension without pay,
> or dismissal—depending on the severity of the infraction) for the following

violations: **(A)** Unpaid Sick Leave (with or without a medical certificate), **(B)** Unpaid Late (more than fourteen (14) minutes late), **(C)** Unauthorized Unpaid Leave.

If you are interested in applying for FMLA, please read the following instructions: [FMLA instructions included]

(Def.'s Mot. Summ. J., Ex. R (emphasis in original).)  Yvonne Howard testified that this letter was generated in part due to the three sick days Plaintiff had called in between June 4, 2008 and June 20, 2008.  (Howard Dep. 133:23–135:20.)

On several occasions thereafter, Plaintiff was notified that he was being treated as AWOL since his use of unscheduled time was not approved.  (DSUF ¶ 38; PRSUF ¶ 38.)  Specifically, on February 28, 2009, Plaintiff called out sick and did not have enough sick leave to cover his shift.  (Pl.'s Mot. Summ. J., Ex. 31.)  At the subsequent hearing for his AWOL violation, Plaintiff explained that since his FMLA leave was exhausted, being on the No Unpaid Leave list was hard to cope with and he was unable to keep track of his leave usage.  (Pl.'s Mot. Summ. J., Ex. 32.)  The penalty was nonetheless upheld and Plaintiff was advised that if he committed another AWOL violation, he would be disciplined.  (Id.)

Thereafter, Plaintiff received four more AWOL policy violations.  On March 18, 2009, Plaintiff was given a two-day suspension.  Following a hearing on May 28, 2009, however, that penalty was rescinded.  (Pl.'s Mot. Summ. J., Ex. 32.)  On August 13, 2009, Plaintiff's car broke down while he was driving to work.  (McCall Dep. 87:16–22.)  He had his car towed to his residence and then called in and requested that his supervisor Bill Broadnax grant him emergency vacation.  (Id.)  Broadnax denied that request and issued him an AWOL.  (Id.)  During the subsequent disciplinary hearing on October 1, 2009, Plaintiff brought in proof of his breakdown and tow truck receipts, but was nonetheless given a two-day suspension.  (Pl.'s Mot. Summ. J.,

Exs. 33, 35; McCall Dep. 89:16–91:22.)   Plaintiff appealed that suspension to HR Manager

Yvonne Howard and filed grievances against both Broadnax and Human Resources manager

Kayla Jones for their conduct at that hearing.  (Pl.'s Mot. Summ. J., Ex. 36.)  During a second-

level grievance hearing on December 4, 2009, Plaintiff's AWOL suspension was rescinded.

(Pl.'s Mot. Summ. J., Exs. 37, 38.)  In a letter dated December 30, 2009, however, Ms. Howard

cautioned Plaintiff that he should be mindful of his leave usage and that leave is at the discretion

of the department and may be denied regardless of whether a supervisor is called or

documentation is submitted.  (Pl.'s Mot. Summ. J., Ex. 38.)  Ms. Howard also stated that

Plaintiff "has demonstrated a pattern of unpaid leave usage."  (Id.)

    On May 1, 2010, Plaintiff called out sick, but claimed he was unable to see his doctor

until May 4, 2010.  (Pl.'s Mot. Summ. J., Exs. 32, 44.)  He provided a doctor's note for this

absence.  (Id., Ex. 44.)  As later revealed by a March 21, 2013 letter, Plaintiff was seen by Dr.

Richard Leavitt for treatment of severe knee pain and depression, "which resulted in an inability

to work from May 1, 2010 until the time of his visit."  (Pl.'s Mot. Summ. J., Ex. 45.)  Kayla

Jones issued Plaintiff an AWOL notice on May 4, 2010 for his May 1, 2010 absence.  (Pl.'s Mot.

Summ. J., Ex. 46.)  Thereafter, on May 12, 2010, she issued a second AWOL notice for

Plaintiff's leave on May 5, 2010.  (Id.)  Although Plaintiff signed the May 12, 2010 notice and

requested a hearing, he never signed off on the May 4, 2010 notice.  (Pl.'s Mot. Summ. J., Ex.

47.)  On June 24, 2010, while Plaintiff was waiting to go into the AWOL hearing, Jones

approached him in the lobby and asked him to sign off on his May 1, 2010 AWOL violation

notice.  When he refused, she "verbally assaulted" him in front of other people.  (McCall Dep.

98:12–100:13.)  Thereafter, she allowed the hearing to get "out of control," ended it prematurely,

and gave Plaintiff a twelve-day suspension (one two-day suspension and one twelve-day suspension).  (Id. at 89:2–12, 98:12–100:13, 181:16–183:2, Pl.'s Mot. Summ. J., Ex. 48.) Subsequently, Airport personnel conducted an investigation of Jones's conduct and she was disciplined by Yvonne Howard.  (Pl.'s Mot. Summ. J., Ex. 51; Def.'s Mot. Summ. J., Ex. X.)

On August 19, 2010, Plaintiff filed an Employee Personal Interview Statement with the United States Department of Labor, Wage and Hour Division asserting that his suspension from July 21, 2010 to August 5, 2010 was directly attributed to the misclassification of his June 2008 FMLA leave as uncertified sick leave and that the AWOL charges for February 28, 2009, May 1, 2010, and May 6, 2010 were all FMLA violations.  (Pl.'s Mot. Summ. J., Ex. 54.)  At some point, the City offered Plaintiff his time back with no restrictions or stipulations, but Plaintiff declined the offer.  (Howard Dep. 245:16–23.)  Eventually, via an agreement reached between the City and the Department of Labor at a Civil Service Hearing in 2011, Plaintiff was issued a check for the unpaid wages for the workweek ending July 25, 2010 through the workweek ending August 8, 2010.  (Pl.'s Mot. Summ. J., Ex. 57.)

### E.   Plaintiff's Separation from City Service

Plaintiff was approved for an unpaid FMLA leave from August 30, 2010 to October 3, 2010, after he submitted medical documentation indicating treatment for severe depression and anxiety.  (Def.'s Mot. Summ. J., Ex. T.)  His twelve-week entitlement ended on October 3, 2010. (Id.).  Due to his ongoing treatment, Plaintiff requested an extension of his leave through January 10, 2011, and provided supporting medical documentation.  (Id.)  The City approved this request. (Id.)  On the last day of his approved leave, Plaintiff contacted the City with a note from his doctor stating that he needed additional unpaid leave through April 5, 2011.  (Def.'s Mot. Summ.

J., Ex. U, Bates No. 433–34.)  The City responded with a letter, dated February 7, 2011,

indicating that his request could not be processed "because the condition for which [he was]

being treated for [was] not listed on [his] doctor's note and [he] did not complete a submit a

leave request (enclosed)."  (Id. at Bates No. 431.)  The letter further advised him that he had until

February 17, 2011 to submit updated medical documentation and a leave request, otherwise he

faced separation  in accordance with the Civil Service Regulations.  (Id.)  During a February 17,

2011 conversation between Plaintiff and DeLaine Williams, a Human Resources representative,

Plaintiff indicated that he could not have the updated medical documentation until Friday,

February 25, 2011.  (Id. at Bates No. 430.)  The City then confirmed via letter of the same date

that, "[s]hould you not submit the updated medical documentation and leave request by February

25, 2011 as you indicated, [you] may be separated in accordance with Philadelphia Civil Service

Regulations."  (Id.)

On February 25, 2011, Plaintiff sent a letter to the Airport enclosing his request form for

his leave.  (Id. at Bates No. 426.)  He remarked that he was unable to see his doctor that day

because the doctor hurt his back, but that he had an appointment scheduled for March 4, 2011.

(Id.)  He promised to supply the additional information at that time.  (Id.)  When no additional

documentation was received by March 23, 2011, the City sent Plaintiff the following letter:

Dear Mr. McCall:

You were approved [for] a Medical Leave of Absence from October 3, 2010 to
January 10, 2011.  Your Medical Leave of Absence expired on January 10, 2011.  A
letter dated February 7, 2011 was sent requesting additional medical documentation
and a leave request by February 17, 2011 to extend your leave of absence.  On
February 17, 2011, you spoke with DeLaine Williams and stated that you could not
have the updated medical documentation until Friday, February 25, 2011.  Delaine
Williams sent you a letter dated February 17, 2011 confirming this conversation.

This office received a fax from you on February 25, 2011 containing the leave of absence request.  You stated in your fax that you could not see your doctor until March 4, 2011 to obtain updated medical documentation.  This office has tried to reach you by phone and has left messages on March 15, 2011 and March 16, 2011 to find out if you have obtained the necessary documentation.  You were informed that if updated medical documentation and leave request was not submitted that you may be separated in accordance with Philadelphia Civil Regulations.

To date, this office has not received the updated medical documentation needed to extend our leave of absence.  Please return this information to my attention at the Division of Aviation, Philadelphia International Airport, Human Resources, Terminal E, Philadelphia PA 19153 or you may fax it to (215) 937-5559.  Should you not submit updated medical certification by March 30, 2011, you will be separated from Civil Service employment in accordance with Philadelphia Civil Service Regulations. Please contact me at (215) 937-5550 if you have any questions regarding the leave of absence process or leave status.

(Id. at Bates No. 448.)  On that same day, Plaintiff forwarded to the City a letter, dated March 2, 2011, indicating that his psychiatrist, Ira Herman, was out due to emergency back surgery and would not be available for approximately two to three weeks.  (Pl.'s Mot. Summ. J., Ex. 77.)

Having not received any further documentation from Plaintiff as of April 5, 2011, Plaintiff was officially separated from the City via letter stating, in pertinent part, as follows:

Dear Mr. McCall:

You were approved a Medical Leave of Absence through January 10, 2011.  You were notified on several occasions of your expired leave.  The department provided you more than ample time to submit the required paperwork to extend your leave of absence or to return to work.  The last due date that you were given to submit paperwork for review was March 30, 2011 . . . .

To date we have not received the information to process an extended leave or clearance to return to duty.  As of today you are not on a valid leave of absence, so you have been in unpaid and AWOL from January 11, 2011 to the present. Therefore, in accordance with Philadelphia Civil Service Regulation 22.01 which states "No officer or employee in the Civil Service shall absent himself from duty without leave except in case of sickness or great emergency.  An employee who is absent from the service without a valid leave of absence for five consecutive working days shall be deemed to have abandoned his position and to have resigned from the

service unless he shall within a period of ten (10) calendar days next succeeding such five (5) days prove to the satisfaction of the Director that such failure was excusable; provided that nothing herein contained shall be construed as preventing an appointing authority from suspending or discharging an employee on account of unauthorized absence" you will be separated from City service.  A report of separation will be forwarded under separate cover.

(Def.'s Mot. Summ. J., Ex. U, Bates No. 449.)

F.    **Procedural History**

On September 10, 2010, Plaintiff filed a written Charge of Discrimination against the City with both the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Rights Commission ("PHRC").  (Third Am. Compl. ¶ 12.)  The EEOC issued a Dismissal and Notice of Rights on June 13, 2011, thereby giving Plaintiff ninety days in which to bring federal civil litigation.  (Id. ¶ 13.)  Plaintiff filed an additional charge of discrimination on June 3, 2011, and on December 21, 2011, the EEOC issued a Dismissal and Notice of Rights. (Id. ¶¶ 15–16.)

Plaintiff initiated the current litigation against Defendant City of Philadelphia, among other divisions of the City, on September 9, 2011.  Plaintiff filed an Amended Complaint on December 16, 2011, a Second Amended Complaint on January 26, 2012, and a Third Amended Complaint on March 28, 2011.  This latest iteration of the Complaint set forth the following causes of action: (1) retaliation under the Family Medical Leave Act ("FMLA"); (2) violation of the Americans with Disabilities Act ("ADA"); and (3) violation of the Pennsylvania Human Rights Act ("PHRA").

On August 9 and August 12, 2013, Plaintiff and Defendant respectively filed Motions for Summary Judgment.  On October 29, 2013, the Court issued a Memorandum and Order granting

14

summary judgment in favor of Defendant as to Plaintiff's FMLA interference claim and claims

pursuant to the ADA.  The Court, however, found that a genuine issue of material fact remained

o the issue of whether the numerous disciplines that Plaintiff received at the hands of Defendant

were motivated either by Plaintiff's use of FMLA leave or by Defendant's allegedly improper

characterization of Plaintiff's FMLA leave as unpaid sick leave.  The case was, therefore,

restricted to this singular claim of FMLA retaliation.

## II.    STANDARD OF REVIEW[2]

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A factual dispute is

"material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to

return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence

that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv.

_____

[2]  Defendant submits this Motion as a Motion for Judgment on the Pleadings, but relies on several matters outside the scope of the pleadings.  Federal Rule of Civil Procedure 12(d) states that, "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  Plaintiff's Response Brief acknowledges this rule and, accordingly, "present[s] 'all material that is pertinent to the motion' as if Defendant's Motion for Judgment on the Pleadings were a Motion for Summary Judgment." (Pl.'s Resp. Opp'n Mot. Judgment on Pleadings 2.)  Given that the Court has already considered extensive summary judgment motions and given that both parties seem to agree that the present Motion may be treated as a summary judgment motion, the Court reviews the present Motion under the Rule 56 standard of review.

Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims."  Id. at 325.  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex, 477 U.S. at 322.  Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue.  Anderson, 477 U.S. at 249–50.

## III.   DISCUSSION

As set forth above, the sole remaining claim in this case is Plaintiff's FMLA retaliation claim related to his numerous AWOL violations.  Defendant now seeks summary judgment as to this remaining issue on the ground that Plaintiff has suffered no damages recoverable under the

FMLA

### A.      Available Remedies Under the FMLA

The FMLA was enacted by Congress in 1993 to help address, in part, problems stemming from "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods."  29 U.S.C. § 2601(a)(4).  Congress designed the FMLA to "balance the demands of the workplace with the needs of families" and "entitle employees to take reasonable leave for medical reasons."  Id. § 2601(b)(1); see also Callison v. City of Phila., 430 F.3d 117, 119 (3d Cir. 2005) (finding that one of the "primary purposes of the FMLA [is] to 'balance the demands of the workplace with the needs of families'").  The FMLA attempts to accomplish these purposes in a "manner that accommodates the legitimate interests of employers."  26 U.S.C. § 2601(b)(3).

The FMLA guarantees eligible employees of covered employers a total of up to twelve work weeks of leave per twelve-month period due to the birth or adoption of a child, the need to care for a spouse, son, or daughter because of their serious health condition, or due to the employee's own serious health condition rendering him unable to perform the functions of his position.  Id. § 2612(a)(1).  Following a qualified absence, an employee is entitled to be reinstated to his or her former position or an equivalent position with equal pay, benefits, and other conditions of employment.  Id. § 2614(a)(1).

The FMLA goes on to explicitly enumerate the remedies available for a violation of its terms as follows:

> Any employer who violates section 2615 of this title shall be liable to any eligible employee affected–

(A) for damages equal to–

    (i) the amount of–

        (I) any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation; or

        (II) in a case in which wages, salary, employment benefits, or other compensation have not been denied or lost to the employee, any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care, up to a sum equal to 12 weeks (or 26 weeks, in a case involving leave under section 2612(a)(3) of this title) of wages or salary for the employee;

    (ii) the interest on the amount described in clause (i) calculated at the prevailing rate; and

    (iii) an additional amount as liquidated damages equal to the sum of the amount described in clause (i) and the interest described in clause (ii), except that if an employer who has violated section 2615 of this title proves to the satisfaction of the court that the act or omission which violated section 2615 of this title was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of section 2615 of this title, such court may, in the discretion of the court, reduce the amount of the liability to the amount and interest determined under clauses (i) and (ii), respectively; and

(B) for such equitable relief as may be appropriate, including employment, reinstatement, and promotion.

29 U.S.C.A. § 2617(a)(1).  In addition, a plaintiff may recover "a reasonable attorney's fee, reasonable expert witness fees, and other costs of the action."  Id. § 2617(a)(3).  These comprehensive, detailed enforcement provisions of the FMLA evidence Congress's intent to make the specific remedies set forth in § 2617 the exclusive remedies available for a violation of the FMLA.  Kilvitis v. Cnty. of Luzerne, 52 F. Supp. 2d 403, 418 (M.D. Pa. 1999).  Emotional damages, pain and suffering, are not compensable under this Act.  Churchill v. Star Enters., No. Civ.A. 11-5689, 1998 WL 254080, at *6 (E.D. Pa. Oct. 29, 1998).  Moreover, punitive damages

are not recoverable under the FMLA.  Haiden v. Greene Cnty. Career & Tech. Ctr., No. Civ.A.

08-1481, 2009 WL 2341922, at *4 (W.D. Pa. July 29, 2009).

### B.      Whether Plaintiff Has Suffered Any Damages Recoverable Under the FMLA

Defendant now seeks an order dismissing Plaintiff's FMLA claim because he has suffered

no damages that can be remedies under the FMLA.  Specifically, it contends that: (1) any loss of

pay during his twelve day suspension from July 25, 2010 to August 8, 2010 has been fully

reimbursed; (2) back pay is not an available FMLA remedy for periods Plaintiff was unable to

work; and (3) Plaintiff cannot recover front pay because he could not return to work and was

lawfully terminated.  The court takes each contention separately

### 1.      Reimbursement of Twelve-day Suspension

As set forth above, Plaintiff was suspended for twelve days as a result of his purportedly

unexcused May 1 and May 6, 2010 absences.  Subsequently, on August 19, 2010, Plaintiff filed

an Employee Personal Interview Statement with the United States Department of Labor, Wage

and Hour Division asserting that his suspension from July 21, 2010 to August 5, 2010 was

directly attributed to the misclassification of his June 2008 FMLA leave as uncertified sick leave

and that the AWOL charges for February 28, 2009, May 1, 2010, and May 6, 2010 were all

FMLA violations.  At some point during the grievance process, the City offered Plaintiff his time

back with no restrictions or stipulations, but Plaintiff declined the offer.  (Howard Dep.

245:16–23.)  Eventually, via an agreement reached between the City and the Department of

Labor at a Civil Service Hearing, Plaintiff was issued a check, dated November 1, 2011, for the

unpaid wages for the workweek ending July 25, 2010 through the workweek ending August 8,

2010.  Defendant asserts that because these wages were fully reimbursed, there are no further

damages Plaintiff can claim under the FMLA as a result of that suspension.

Defendant's argument, however, disregards an explicit section of the FMLA damages provision.  As set forth above, 29 U.S.C.A. § 2617(a)(1) provides that in addition to lost wages or salary, an individual whose FMLA rights have been violated is entitled to both the interest on the lost wages/salary and an additional amount as liquidated damages.  The United States Court of Appeals for the Tenth Circuit provided some helpful clarification on this provision.  In Jordan v. United States Postal Service, 379 F.3d 1196 (10th Cir. 2004), the plaintiff had been terminated and, after he filed a grievance, had his termination reduced to a six-month suspension.  Id. at 1199.  Following further settlement negotiations, the employer reimbursed the plaintiff full back pay for the suspension, plus interest, and restored all leave that would have accrued in that time. Id.  That repayment was provided approximately eight months after the suspension began.  Id. During the subsequent bench trial, the district court found that the employer had retaliated against the plaintiff in violation of the FMLA, but declined to award him damages on the ground that he had already received back pay and awarding such pay again would result in a windfall. Id.  On appellate review, the Tenth Circuit addressed the question of "whether wages that are unlawfully denied but restored before trial, but after a significant delay are 'denied or lost' wages under the FMLA."  Id. at 1201.  The court concluded that they were "denied or lost," reasoning as follows:

> Since the FMLA makes employers liable for both lost wages and liquidated damages, we cannot conclude that under the FMLA, an employer like Appellee, who denies an employee his wages but restores them prior to trial, but after a significant delay, avoids liability for liquidated damages.  If this were the case, employers who wrongfully denied wages could escape liability for liquidated damages by simply restoring the lost wages at any time before trial.  We think this result cannot be squared with the language or structure of the FMLA damages provision.  Therefore,

> we conclude that temporarily lost wages that are restored prior to trial, but after a significant delay, are "lost or denied" for purposes of calculating liquidated damages under the FMLA.

Id.

In the present case, there is no dispute of fact that Plaintiff was reimbursed full back pay for his twelve-day suspension.  It is similarly undisputed that a lapse of approximately fifteen months occurred between the last day of his suspension and Defendant's repayment of the back wages.  Nothing in the record reveals that Plaintiff was paid any interest or liquidated damages on such wages.  Should a trier of fact ultimately conclude that the suspension was the result of retaliation against Plaintiff under the FMLA, Plaintiff may then claim both interest and liquidated damages on the lost wages.[3]  Accordingly, the Court rejects Defendant's argument that Plaintiff has no available damages under his remaining FMLA claim and will deny Defendant's Motion as to interest and liquidated damages.

### 2.    **Back Pay and Front Pay**

Additionally, in his Complaint, Plaintiff alleges that "as a direct and proximate result of Defendant's retaliation, Plaintiff has in the past incurred and may in the future suffer a loss of earnings, a loss of earning capacity, a loss of benefits, and was discharged from his employment." (Compl. ¶ 170.)  Plaintiff contends that the allegedly retaliatory acts by the Defendant caused the severe anxiety and depression that rendered him unable to work, causing his need to take unpaid FMLA leave and additional unpaid medical leave, and ultimately resulting in his inability to return to work at the end of his medical leave of absence.  As such, he now seeks damages for his lost wages, in the form of back pay for the period of his unpaid

---

[3]  Notably, Plaintiff may not make a double recovery for the already-reimbursed wages.

leaves—July 1, 2010 through April 4, 2011—and front pay for his loss of earning capacity from his termination date forward.  The Court addresses the back and front pay questions separately.

### a.    **Back Pay**

The "back pay" portion of Plaintiff's damages claim alleges that he is entitled to lost wages for period of his unpaid leaves because the retaliatory acts of Defendant caused the stress and anxiety that necessitated such leaves.  The question now before the Court is whether the FMLA permits recovery of such wages.  Upon review of the pertinent jurisprudence, the Court concludes that it does not.

Although the Third Circuit Court of Appeals has yet to address this particular issue, several courts, both within and outside the Third Circuit, have offered guidance on this question. In Murray v. JELD-WEN, Inc., the plaintiff had a documented stress disorder for which he was out on FMLA leave.  922 F. Supp. 2d 497, 505 (M.D. Pa. 2013).  During that leave, his position was eliminated, causing an exacerbation of his condition and resulting in both the need for FMLA leave and the ultimate inability to return to work.  Id.  The court found that recovery of such damages was not available under the FMLA, "as neither the FMLA nor related regulations concern themselves with the cause of injury."  Id. at 507.  Ultimately, it held that the exacerbation theory was not viable under the FMLA.  Id.

In reaching that ruling, the Murray court followed the majority of jurisprudence similarly rejecting such an exacerbation theory.  For example, in Edgar v. JAC Products, Inc., 443 F.3d 501 (6th Cir. 2006), the plaintiff had to take extended leave purportedly due to exacerbated stress caused by the defendant's improper conduct under the FMLA.  Id. at 504.  The court rejected this "exacerbation theory" of liability, reasoning that FMLA regulations focus "on whether a

'physical or mental condition' prevents the employee from returning to work, not on the cause of that condition or, for that matter, whether that condition is the same one that forced the employee to take a medical leave in the first place." Id. at 516.  It concluded that, "the FMLA—and the authoritative regulation interpreting it—is concerned not with *how* a serious physical or mental ailment occurred, but with whether that ailment precluded the employee from performing an essential function of his or her job at the end of the leave period." Id.  In the final analysis, the court logically reasoned that "[b]ecause the stress inherent in adverse employment decisions will tend to aggravate most forms of mental or emotional instability, an argument that summary judgment is precluded by factual disputes as to whether the actions of the employer worsened the employee's mental state and prevented the employee from resuming his or her position could become standard fare." Id. at 516.

The Seventh Circuit reached a similar conclusion in Breneisen v. Motorola, Inc., 656 F.3d 701 (7th Cir. 2011), cert. denied, 132 S. Ct. 2382 (2012).  In that matter, the plaintiff argued that the alleged mistreatment from his supervisor upon return from a medical leave of absence exacerbated his condition and caused him to take another leave of absence from which he never returned. Id. at 704.  The court declined to find that exacerbation was a valid theory of liability under the FMLA. Id. at 705.  It reasoned that "[s]ince stress can adversely affect many common ailments from which physically infirm employees suffer, granting relief on this basis would contravene the straightforward premise of the FMLA—to protect employees from adverse actions by their employers during finite periods when short-term personal or family medical need require it." Id.  It concluded that "[w]hen serious medical issues render an employee unable to work for longer than the twelve-week period contemplated under the statute, the FMLA no

longer applies.  This is true regardless of the cause of the infirmity."  Id.

Multiple other district courts have reached the same conclusion.  See, e.g., Quinn v. St. Louis Cnty., No. Civ.A.09-1372, 2010 WL 3733970, at *6 (D. Minn. Sept. 20, 2010) ("[I]t would be untenable for federal courts to award damages for work-related personal injuries merely because a plaintiff has made allegations that an FMLA violation falls somewhere along the margins of the universe of factual causes of an injury, especially when tort law and workers' compensation schemes exist), aff'd, 653 F.3d 745 (8th Cir. 2011); Rodriguez v. Smithfield Packaging Co., 545 F. Supp. 2d 508, 524 n.18 (D. Md. 2008) ("Even if Plaintiff were able to prove that her employer's wrongful termination caused or worsened a serious health condition such as to cause the employee to be unable to return to work where she otherwise could have done so, her argument fails as a matter of law); Santrizos v. Evergreen Fed. Sav. & Loan Assoc., No. Civ.A.06-866, 2007 WL 3544211, at *7 (D. Or. 2007) (rejecting plaintiff's claim that termination during her leave exacerbated condition and had he not been terminated, he could have returned to work after a twelve-week leave); Johnson v. Ga. Television Co., 435 F. Supp. 2d 1237, 1240–41 (N.D. Ga. 2006) (finding plaintiff not entitled to damages under FMLA where retaliation allegedly caused her to miss work by exacerbating her fibromyalgia); Harbuck v. Briggs Equip., No. Civ.A.05-342, 2006 WL 2168096, at *7 (S.D. Tex. July 31, 2006) (denying FMLA recover for plaintiff whose leg infection was allegedly caused by employer's refusal to allow FMLA leave); Dawson v. Leewood Nursing Home, Inc., 14 F. Supp. 2d 828, 833 (E.D. Va. 1998) (holding that plaintiff could not recover future wages on a theory that employer's FMLA

24

violation aggravated her medical condition and caused her to be incapacitated).[4]

The Court is persuaded by this great weight of authority.  The FMLA is concerned with substantive related to employment leave for medical reasons.  See 29 U.S.C. § 2617 (allowing recovery only of monetary damages that are a "direct result" of an FMLA violation).  To allow a plaintiff to recover damages for days lost purportedly due to an exacerbation or creation of an impairment caused by an FMLA violation would inject a tort theory and causation analysis into a carefully-designed statutory scheme.  The Court finds nothing to suggest that Congress intended such a result.  Accordingly, the Court follows the well-reasoned jurisprudence from sister courts within this Circuit, as well as the multitude of courts outside this Circuit.

Applying that conclusion to the present case results in a dismissal of Plaintiff's claims for back pay.  Plaintiff was unable to work during the periods he was on unpaid FMLA leave and unpaid medical leave.  Even if Plaintiff could prove that the disabling medical condition was a direct result of the alleged FMLA retaliation, the FMLA does not concern itself with the cause of injury.  Certainly, Plaintiff would have been free to pursue a tort claim against the perpetrators of the acts that allegedly caused his anxiety and depression.  The statutory scheme of the FMLA,

---

[4]  The sole contrary appellate decision on this issue arose in the Ninth Circuit case of Farrell v. Tri-County Metropolitan Transportation, 530 F.3d 1023 (9th Cir. 2008).  In that matter, the plaintiff took repeated FMLA leaves due to his medical conditions, such as diabetes, asthma, and other physical ailments.  Id. at 1024.  His employer denied several of his requests and, shortly thereafter, he was diagnosed with several mental conditions.  Id.  The jury awarded the plaintiff damages for days lost as a result of those mental impairments on the theory that the FMLA violation caused those impairments.  Id. at 1025.  In a cursory opinion accompanied by little explanation, the Ninth Circuit affirmed the award of damages, not for mental distress, but for days of work missed because of mental problems caused by the wrongful denial of FMLA leave.  Id.; accord Bordeau v. Saginaw Eng'g, 446 F. Supp. 2d 766, 771 (E.D. Mich. 2006) (noting that lost wages due to a medical condition caused by the denial of FMLA leave may recoverable).  Farrell appears to stray from the FMLA's dictates and, as such, the Court accords it little weight.

however, does not allow him to seek back pay for such an allegation. Therefore, the Court will grant judgment in favor of Defendant on this portion of Plaintiff's damages request.

**b.** __Front Pay__

Finally, Plaintiff seeks front pay damages stemming from his ultimate termination. Specifically, he asserts that he could not return to work because of his exacerbated mental health condition caused by the alleged retaliation by Defendant. As a result, he claims entitlement to damages for future lost wages from the date of his termination.

Plaintiff's argument on this point is completely misplaced. "'[O]nce an employee exceeds the duration of her protected leave, the employer is not obligated by FMLA to keep open the position or to reinstate the employee upon her return.'" Hofferica v. St. Mary Med. Ctr., 817 F. Supp. 2d 569, 577 (E.D. Pa. 2011) (quoting Keim v. Nat'l R.R. Passenger Corp., No. Civ.A.05-4338, 2007 WL 2155656, at *6 (E.D. Pa. Jul 26, 2007)). Thus, although "[a]n employer may not terminate an employee because he or she has taken the leave permitted by the statute[,] . . . [i]f the employee is not able to return to work after twelve weeks . . . the employer may terminate the employee." Katekovich v. Team Rent A Car, Inc., 36 F. App'x 688, 690 (3d Cir. 2002). It is well settled that the end point for calculated damages under the FMLA is when the employer lawfully terminated the plaintiff for failing to return to work. Mohl v. Cnty of Lebanon, 939 F. Supp. 2d 504, 509–10 (M.D. Pa. 2013) (citing Lapham v. Vanguard Cellular Sys., 102 F. Supp. 2d 266 (M.D. Pa. 2000)); see also Franzen v. Ellis Corp., 543 F.3d 420, 426 (7th Cir. 2008) (holding that where a plaintiff is unwilling or unable to return to work after expiration of medical or FMLA leave, the employer can lawfully terminate the employment and plaintiff is not entitled to damages resulting from that termination); Harbuck v. Briggs Equip.,

No. Civ.A.05-342, 2006 WL 2168096, at *7 (S.D. Tex. July 31, 2006) ("Once [defendant]

lawfully teminated its employment relationship with Plaintiff, any liability for further wages

ceased.").

On summary judgment review in the present case, this Court conclusively found that

Defendant lawfully terminated Plaintiff's employment.  Specifically, the Court noted that:

> Plaintiff had been approved for an unpaid FMLA leave from August 30, 2010 to
> October 3, 2010, after he submitted medical documentation supporting his depression
> and anxiety. . . . In light of his ongoing treatment, Plaintiff requested an extension of
> his leave through January 10, 2011, and provided supporting medical documentation.
> . . . Despite the fact that Plaintiff had exhausted his FMLA entitlements, the City
> accommodated his disability and approved this request. . . . On the last day of his
> approved leave, Plaintiff contacted the City seeking additional unpaid leave through
> April 5, 2011. . . . The City responded that his request could not be processed
> "because the condition for which [he was] being treated for [was] not listed on [his]
> doctor's note and [he] did not complete a submit a leave request (enclosed)." . . . The
> City further advised him that he had until February 17, 2011 to submit updated
> medical documentation and a leave request. . . . Nothing in this letter suggests that
> Plaintiff was being denied extended leave.
>
> Repeatedly thereafter, Plaintiff promised to provide the requested documentation.
> Indeed, on no less than four occasions, the City provided Plaintiff extensions of time
> in  which  to  provide  the  promised  information.    Only  on  April  5,
> 2011—approximately *four months* after his already extended leave had ended and
> after Plaintiff failed to follow through on his multiple promises to supply
> documentation that would support a further extension—the City terminated him.
> There is no indication in the record that had Plaintiff provided the requested
> information, the City would not have granted his extended leave.  Moreover, it is
> notable that the City waited until April 5, 2011 to terminate Plaintiff, as this was the
> date provided by his doctor in his last note of January 10, 2011.  Accordingly, the
> City effectively granted the requested the extended leave.  Only when Plaintiff failed
> to show either indications of returning to work or an ability to return to work did the
> City terminate his employment.

McCall v. City of Phila., No. Civ.A.11-5689, 2013 WL 5823873, at *25 (E.D. Pa. Oct. 29, 2013)

(internal citations omitted).  Given that Plaintiff had no further FMLA cause of action as of

October 23, 2010—the date his FMLA leave was exhausted and he failed to return to work—

Plaintiff is hard-pressed to argue that his termination more than five months later—due to his continued to failure to either return to work after extended medical leave or supply requested medical documentation—was a violation of the FMLA permitting the recovery of front pay.[5]  As such, summary judgment on this portion of Plaintiff's damage request is likewise granted in favor of Defendant.

## III.    CONCLUSION

For all of the foregoing reasons, the Court grants in part and denies in part Defendant's Motion for Summary Judgment.  As to Plaintiff's claims for front pay and back pay during the time period that he was on unpaid medical leave or terminated from employment purportedly because of a medical condition caused by Defendant's alleged retaliation, these claims for damage are dismissed.  As to Plaintiff's claims for damages during his two-week suspension, the Court finds that to the extent Plaintiff can prove unlawful FMLA retaliation, Plaintiff may set forth a claim for interest and liquidated damages.

An appropriate Order follows.

---

[5]  Plaintiff spends more than ten pages of his Response to Defendant's Motion attempting to prove that his termination was unlawful.  These assertions are nothing more than a rehash of Plaintiff's previous arguments—arguments that this Court has already considered and rejected both on summary judgment and in the motion for reconsideration.  The Court will not expend any additional time restating the reasons why these contentions are meritless.